B2500A (Form 2500A) (12/15)

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | * | CHAPTER 11 |
| | * | |
| FIRST NBC BANK HOLDING COMPANY, | * | CASE NO. 17-11213 |
| | * | |
| Debtor, | * | SECTION "A" |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| | * | |
| ZURICH AMERICAN INSURANCE COMPANY | * | |
| Plaintiff, | * | |
| | * | |
| VERSUS | * | |
| | * | |
| GREGORY ST. ANGELO, WILLIAM D. | * | |
| AARON, JR., HERBERT W. ANDERSON, | * | ADV. P. NO. 20-01005 |
| DALE ATKINS, JOHN C. CALHOUN, | * | |
| WILLIAM CARROUCHE, | * | |
| LEANDER J. FOLEY, III, JOHN F. FRENCH, | * | |
| LEON GIORGIO, JR., SHIVAN GOVIDAN, | * | |
| LAWRENCE BLAKE JONES, LOUIS | * | |
| LAURICELLA, MARK MERLO, | * | |
| HERMAN MOYSE, III, GRISH LLOYD | * | |
| PANDIT, JAMES RODDY, DR. CHARLES | * | |
| TEAMER, JOSEPH TOOMY, RICHARD M. | * | |
| WILKINSON, LOUIS BALLERO, MARSHA | * | |
| CROWLE, MARY BETH VERDIGETS, | * | |
| FRANK FUGETTA AND MICHAEL LULICH | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## SUMMONS IN AN ADVERSARY PROCEEDING

**TO:** Zurich American Insurance Company

YOU ARE SUMMONED and required to file a motion or answer to the counterclaims which is attached to this summons with the clerk of the bankruptcy court within 30 days after the date of issuance of this summons, except that the United States and its offices and agencies shall file a motion or answer to the complaint within 35 days.

> Address of the clerk:
> United States Bankruptcy Court
> Eastern District of Louisiana
> Hale Boggs Federal Building
> 500 Poydras Street, Suite B-601
> New Orleans, LA 70130

B2500A (Form 2500A) (12/15)

At the same time, you must also serve a copy of the motion or answer upon the plaintiff's attorney.

                    Name and Address of Plaintiff's Attorney:
                    Eric J. Derbes
                    The Derbes Law Firm, LLC
                    3027 Ridgelake Drive
                    Metairie, LA 70002

If you make a motion, your time to answer is governed by Fed. R. Bankr. P. 7012.

**IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE BANKRUPTCY COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

                                      S/ Sheila Booth  (Clerk of the Bankruptcy Court)

Date: March 25, 2020                 By: s/ Jennifer Nunnery (Deputy Clerk)



B2500A (Form 2500A) (12/15)

# CERTIFICATE OF SERVICE

I, _Bryan J. O'Neill_____ (name), certify that service of this summons and a copy of the complaint was made___March 27, 2020_____ (date) by:

☒ Mail service: Regular, first class United States mail, postage fully pre-paid,
addressed to: Zurich American Insurance Company, through counsel of record:
John W. Hite, III
One Canal Place
365 Canal Street, Suite 1710
New Orleans, LA 70130

❑ Personal Service: By leaving the process with the defendant or with an officer or agent of defendant at:

❑ Residence Service: By leaving the process with the following adult at:

❑ Certified Mail Service on an Insured Depository Institution: By sending the process by certified mail addressed to the following officer of the defendant at:

❑ Publication: The defendant was served as follows: [Describe briefly]

❑ State Law: The defendant was served pursuant to the laws of the State of_____, as follows: [Describe briefly]

If service was made by personal service, by residence service, or pursuant to state law, I further certify that I am, and at all times during the service of process was, not less than 18 years of age and not a party to the matter concerning which service of process was made.

Under penalty of perjury, I declare that the foregoing is true and correct.

Date_03/27/2020_____    Signature _____

Print Name:          _Bryan J. O'Neill_____

Business Address:    _3027 Ridgelake Drive_____

                     _Metairie, LA 70002_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | * | CHAPTER 11 |
| | * | |
| FIRST NBC BANK HOLDING COMPANY, | * | CASE NO. 17-11213 |
| | * | |
| Debtor, | * | SECTION "A" |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| | * | |
| ZURICH AMERICAN INSURANCE COMPANY | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| VERSUS | * | |
| | * | |
| GREGORY ST. ANGELO, WILLIAM D. | * | |
| AARON, JR., HERBERT W. ANDERSON, | * | ADV. P. NO. 20-01005 |
| DALE ATKINS, JOHN C. CALHOUN, | * | |
| WILLIAM CARROUCHE, | * | |
| LEANDER J. FOLEY, III, JOHN F. FRENCH, | * | |
| LEON GIORGIO, JR., SHIVAN GOVIDAN, | * | |
| LAWRENCE BLAKE JONES, LOUIS | * | |
| LAURICELLA, MARK MERLO, | * | |
| HERMAN MOYSE, III, GRISH LLOYD | * | |
| PANDIT, JAMES RODDY, DR. CHARLES | * | |
| TEAMER, JOSEPH TOOMY, RICHARD M. | * | |
| WILKINSON, LOUIS BALLERO, MARSHA | * | |
| CROWLE, MARY BETH VERDIGETS, | * | |
| FRANK FUGETTA AND MICHAEL LULICH | * | |
| | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**ANSWER, AFFIRMATIVE DEFENSES, CROSSCLAIMS AND COUNTERCLAIMS TO
COMPLAINT FOR INTERPLEADER AND FOR DECLARATORY RELIEF**

NOW INTO COURT, through undersigned counsel, comes Defendants Frank Fugetta

("Fugetta") and Michael Lulich ("Lulich") (collectively referred to as "Fugetta and Lulich"), to

answer the *Complaint for Interpleader and for Declaratory Relief* filed by Zurich American

Insurance Company ("Zurich" or "Plaintiff"), as follows.

**ANSWER**

Fugetta and Lulich answer the allegations of Plaintiff's Complaint as follows.

1.

The allegations contained in Paragraph numbered 1 of the Complaint are admitted.

2.

The allegations contained in Paragraph numbered 2 of the Complaint are admitted.

3.

The allegations contained in Paragraph numbered 3 of the Complaint assert a legal conclusion and do not require a response or a denied for lack of sufficient information to justify a belief therein, except to admit that Fugetta and Lulich have demanded that Zurich not make any further payments from the Policy proceeds to Defendant Gregory St. Angelo and that those same funds be used to pay their own Loss incurred under the Policy.

4.

The allegations contained in Paragraph numbered 4 of the Complaint assert a legal conclusion and do not require a response.

5.

The allegations contained in Paragraph numbered 5 of the Complaint assert a legal conclusion and do not require a response

6.

The allegations contained in Paragraph numbered 6 of the Complaint are denied for lack of sufficient information to justify a belief therein.

7.

The allegations contained in Paragraph numbered 7 of the Complaint are denied for lack of sufficient information to justify a belief therein.

8.

The allegations contained in Paragraph numbered 8 of the Complaint are denied for lack of sufficient information to justify a belief therein.

9.

The allegations contained in Paragraph numbered 9 of the Complaint are denied for lack of sufficient information to justify a belief therein.

10.

The allegations contained in Paragraph numbered 10 of the Complaint are denied for lack of sufficient information to justify a belief therein.

11.

The allegations contained in Paragraph numbered 11 of the Complaint are denied for lack of sufficient information to justify a belief therein.

12.

The allegations contained in Paragraph numbered 12 of the Complaint are denied for lack of sufficient information to justify a belief therein.

13.

The allegations contained in Paragraph numbered 13 of the Complaint are denied for lack of sufficient information to justify a belief therein.

14.

The allegations contained in Paragraph numbered 14 of the Complaint are denied for lack of sufficient information to justify a belief therein.

15.

The allegations contained in Paragraph numbered 15 of the Complaint are denied for lack of sufficient information to justify a belief therein.

16.

The allegations contained in Paragraph numbered 16 of the Complaint are denied for lack of sufficient information to justify a belief therein.

17.

The allegations contained in Paragraph numbered 17 of the Complaint are denied for lack of sufficient information to justify a belief therein.

18.

The allegations contained in Paragraph numbered 18 of the Complaint are denied for lack of sufficient information to justify a belief therein.

19.

The allegations contained in Paragraph numbered 19 of the Complaint are denied for lack of sufficient information to justify a belief therein.

20.

The allegations contained in Paragraph numbered 20 of the Complaint are denied for lack of sufficient information to justify a belief therein.

21.

The allegations contained in Paragraph numbered 21 of the Complaint are denied for lack of sufficient information to justify a belief therein.

22.

The allegations contained in Paragraph numbered 22 of the Complaint are denied for lack of sufficient information to justify a belief therein.

23.

The allegations contained in Paragraph numbered 23 of the Complaint are denied for lack of sufficient information to justify a belief therein.

24.

The allegations contained in Paragraph numbered 24 of the Complaint are denied for lack of sufficient information to justify a belief therein.

25.

The allegations contained in Paragraph numbered 25 of the Complaint are denied for lack of sufficient information to justify a belief therein.

26.

The allegations contained in Paragraph numbered 26 of the Complaint are denied for lack of sufficient information to justify a belief therein.

27.

The allegations contained in Paragraph numbered 27 of the Complaint are denied for lack of sufficient information to justify a belief therein.

28.

The allegations contained in Paragraph numbered 28 of the Complaint are denied for lack of sufficient information to justify a belief therein.

29.

The allegations contained in Paragraph numbered 29 of the Complaint are admitted.

30.

The allegations contained in Paragraph numbered 30 of the Complaint are admitted.

31.

The allegations contained in Paragraph numbered 31 of the Complaint are admitted.

32.

The allegations contained in Paragraph numbered 32 of the Complaint are denied as stated. In particular, Fugetta and Lulich specifically aver that Gregory St. Angelo does not qualify as an Insured Person as defined in the Policy.

33.

The allegations contained in Paragraph numbered 33 of the Complaint are admitted.

34.

The allegations contained in Paragraph numbered 34 of the Complaint refer to a written document, which is the best evidence of its contents.

35.

The allegations contained in Paragraph numbered 35 of the Complaint refer to a written document, which is the best evidence of its contents.

36.

The allegations contained in Paragraph numbered 36 of the Complaint refer to a written document, which is the best evidence of its contents.

37.

The allegations contained in Paragraph numbered 37 of the Complaint refer to a written document, which is the best evidence of its contents.

38.

The allegations contained in Paragraph numbered 38 of the Complaint refer to a written document, which is the best evidence of its contents.

39.

The allegations contained in Paragraph numbered 39 of the Complaint refer to a written document, which is the best evidence of its contents.

40.

The allegations contained in Paragraph numbered 40 of the Complaint refer to a written document, which is the best evidence of its contents.

41.

The allegations contained in Paragraph numbered 41 of the Complaint refer to a written document, which is the best evidence of its contents.

42.

The allegations contained in Paragraph numbered 42 of the Complaint refer to a written document, which is the best evidence of its contents.

43.

The allegations contained in Paragraph numbered 43 of the Complaint refer to a written document, which is the best evidence of its contents.

44.

The allegations contained in Paragraph numbered 44 of the Complaint refer to a written document, which is the best evidence of its contents.

45.

The allegations contained in Paragraph numbered 45 of the Complaint are denied for lack of sufficient information to justify a belief therein.

46.

The allegations contained in Paragraph numbered 46 of the Complaint are denied for lack of sufficient information to justify a belief therein, except to admit that Fugetta and Lulich have made demand upon Zurich to provide coverage and a defense under the Policy.

47.

The allegations contained in Paragraph numbered 47 of the Complaint refer to Orders of this Court, which are the best evidence of their contents.

48.

The allegations contained in Paragraph numbered 48 of the Complaint are admitted.

49.

The allegations contained in Paragraph numbered 49 of the Complaint are admitted.

50.

The allegations contained in Paragraph numbered 50 of the Complaint are admitted.

51.

The allegations contained in Paragraph numbered 51 of the Complaint are admitted.

52.

The allegations contained in Paragraph numbered 52 of the Complaint are denied for lack of sufficient information to justify a belief therein, except to admit that Fugetta and Lulich are former officers of First NBC Bank and have submitted claims under the Policy for reimbursement of their attorney's fees and expenses.

53.

The allegations contained in Paragraph numbered 53 of the Complaint are denied for lack of sufficient information to justify a belief therein.

54.

The allegations contained in Paragraphed number 54 of the Complaint are admitted.

55.

The allegations contained in Paragraphed number 55 of the Complaint are admitted.

56.

The allegations contained in Paragraph numbered 56 of the Complaint are denied as stated.

57.

The allegations contained in Paragraph numbered 57 of the Complaint refer to allegations previously set forth in the Complaint and as such, Fugetta and Lulich refer back to each specific Paragraph for their answer to such, and to the extent further response is required, the remaining allegations are denied.

58.

The allegations contained in Paragraph numbered 58 of the Complaint assert a legal conclusion and do not require a response.

59.

The allegations contained in Paragraph numbered 59 of the Complaint assert a legal conclusion and do not require a response.

60.

The allegations contained in Paragraph numbered 60 of the Complaint is a request for relief and does not require a response. To the extent an answer is deemed necessary, the allegations are denied as stated.

61.

The allegations contained in Paragraph numbered 61 of the Complaint is a request for relief and does not require a response. To the extent an answer is deemed necessary, the allegations are denied.

62.

The allegations contained in Paragraph numbered 62 of the Complaint is a request for relief and does not require a response. To the extent an answer is deemed necessary, the allegations are denied.

63.

The allegations contained in Paragraph numbered 60 of the Complaint is a request for relief and does not require a response. To the extent an answer is deemed necessary, the allegations are denied.

64.

Out of an abundance of caution, Fugetta and Lulich denies all allegations of Plaintiffs' Complaint which may be contained in any unnumbered, misnumbered, or remaining paragraphs and all other allegations not specifically admitted herein.

## AFFIRMATIVE DEFENSES

Fugetta and Lulich assert the following affirmative defenses to the Complaint:

65.

### *Gregory St. Angelo does not qualify as an "Insured Person" under the Policy*

The Policy defines an Insured Person as:

1. any one or more natural persons who were, now or shall become a duly elected or appointed director, trustee, governor, Manager, officer, advisory director, or member of a duly constituted committee or board of the Company or their functional equivalent;
2. any one or more natural persons not described in Subsection 1 above who were, now are or shall become Employees of the Company;
3. Independent Contractors only for purposes of Insuring Clause I.B; and
4. Any one or more natural persons described in Subsection 1 above while serving in an Outside Position.

66.

Gregory St. Angelo was never an officer, director, or employee of First NBC Bank, as St. Angelo merely served as First NBC Bank's general counsel. Therefore, St. Angelo does not qualify as an "Insured Person" under the Policy.

67.

### *Judicial Estoppel*
### *Coverage of St. Angelo is excluded under the Policy*

Two exclusions in the Policy require Zurich to deny coverage of St. Angelo Coverage under the Policy, namely Section IV (I) and (J) which provide:

The Insurer shall not be liable under this Coverage Part for Loss on account of, and shall not be obligated to defend, any Claim made against any Insured Person:

> I. based upon, arising out of or attributable to any deliberately fraudulent act or omission or any willful violation of any statute or regulation committed by such Insured Person, if a final non-appealable adjudication adverse to such Insured Person in any proceeding not brought by the Insurer establishes such a deliberately fraudulent act of omission or willful violation;

> J. based upon, arising out of or attributable to such Insured Person gaining any profit, remuneration or financial advantage to which such Insured Person was not legally entitled, if a final and non-appealable adjudication adverse to such Insured Person in any proceeding not brought by the Insurer establishes such Insured Person in fact gained any such profit, remuneration or advantage.

68.

St. Angelo has sworn to the following facts, *inter alia*:

(a) "St. Angelo and others known and unknown to the United States Attorney, did knowingly and willfully combine, conspire, confederate, and agree to commit offenses against the United States of America, that is: knowingly and with intent to defraud, execute and attempt to execute a scheme and artifice to defraud First NBC Bank, a financial institution, and to obtain any of the moneys, funds, credits, and assets, owned by, and under the custody or control of First NBC Bank, by means of false and fraudulent pretenses, representations, and promises…"

(b) "St. Angelo, Bank President A, Bank Officer B, and others provided First NBC Bank with materially false and fraudulent financial statements, collateral summaries, and other documents that, among other things, overstated the value of St. Angelo's and the Entities' assets and understated their liabilities. The materially false and fraudulent financial statements, collateral summaries, and other documents disguised St. Angelo's and the Entities' true financial condition."

(c) "St. Angelo and his co-conspirators obtained loans for individuals associated with St. Angelo as nominees ("the Nominee Loans"). These Nominee Loans benefitted St. Angelo and the nominees. Under this scheme, the nominees signed loan paperwork making it appear that the nominee was taking out the loan. In fact, some proceeds from the Nominee Loans were used by St. Angelo, not the nominees, to pay St. Angelo's existing debts to First NBC Bank for his and the Entities' expenses. St. Angelo, Bank President A, and Bank Officer B caused representatives of First NBC Bank to transfer the Nominee Loan proceeds to the Entities' deposit accounts."

(d) "Bank President A, St. Angelo, Bank Officer B, and others created fake tax credit investments that First NBC Bank made in entities owned or purportedly owned by St. Angelo. In reality, Bank President A, St. Angelo, Bank Officer B, and others designed the

fake tax credit investments to funnel money from First NBC Bank's general ledger to St. Angelo and the Entities, so he could make loan payments and cover overdrafts."

*See Factual Basis* **[P-28]**, *United States of America v. Gregory St. Angelo*, United States District Court for the Eastern District of Louisiana, Criminal Docket No. 19-00055, attached hereto as **Exhibit A** and incorporated by reference.

69.

St. Angelo has pleaded guilty to a federal charge of conspiracy to commit bank fraud. *See* Plea Agreement **[P-27]** and Bill of Information for Conspiracy to Commit Bank Fraud and Notice of Forfeiture **[P-1]**, *United States of America v. Gregory St. Angelo*, United States District Court for the Eastern District of Louisiana, Criminal Docket No. 19-00055.

70.

St. Angelo's guilty plea triggers both the exclusions listed in paragraph 67 as St. Angelo has admitted to committing a deliberate fraudulent act. Therefore, he is judicially estopped from arguing to the contrary. S*ee e.g. Newby v. Enron Corp.*, 391 F. Supp.2d 541, 575 (SD Tx. 2005).

71.

To the extent that any other admission contained in the *Factual Basis* constitutes an exclusion under the Policy, St. Angelo should not be covered under the Policy for those acts as well. St. Angelo is judicially estopped from asserting anything contrary to the facts stipulated and agreed to as true and correct in the *Factual Basis*.

72.

Further, St. Angelo gained a financial advantage to which he was not legally entitled through his admitted illegal actions.

## CROSSCLAIM

### 73.

AND NOW, through undersigned counsel, come Fugetta and Lulich now made Plaintiffs-in-crossclaim, against Defendant, Gregory St. Angelo, who respectfully aver as follows:

### *Parties, Jurisdiction, and Venue*

### 74.

Fugetta, Plaintiff-in-crossclaim, is an individual of the age of majority who is domiciled in Louisiana.

### 75.

Lulich, Plaintiff-in-crossclaim, is an individual of the age of majority who is domiciled in Louisiana.

### 76.

Made defendant in the crossclaim is Gregory St. Angelo, a person of the full age of majority, domiciled in Louisiana.

### 77.

Plaintiffs-in-crossclaim hereby incorporate the allegations set forth in paragraphs 65 through 72 as if fully set forth herein.

### 78.

First NBC Bank Holding Company filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code on May 11, 201 7, in the United States Bankruptcy Court for the Eastern District of Louisiana (No. 17-11213).

79.

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334, Federal Rule of Civil Procedure 22, and Federal Bankruptcy Rule of Procedure 7022.

80.

Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

81.

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334, Federal Rule of Bankruptcy Procedure 7013 and Federal Bankruptcy Rule of Procedure 7022.

82.

The statutory bases for the relief of the causes herein are 28 U.S.C. §1335 (the Federal Interpleader Statute), where Plaintiffs'-in-counterclaim compulsory counterclaims must be plead pursuant to Fed. R. Bankr. P. 7013,[1] and 28 U.S.C. §2201 (the Declaratory Judgment Act).

**FACTS**

83.

According to St. Angelo's *Answer, Affirmative Defenses and Counterclaim to Complaint for Interpleader and for Declaratory Relief* **[P-66]**, "Zurich has paid St. Angelo approximately $641,616.57 in defense costs related to the federal criminal investigation."

84.

St. Angelo was never an officer, director, or employee of First NBC Bank, as St. Angelo merely served as First NBC Bank's general counsel.

---

[1] *See New York Life Ins. Co. v. Deshotel*, 946 F.Supp. 454, 461 (E.D. La. 1996) ("It now seems settled that (Fed. R. Civ. P.) Rule 13 which provides for compulsory and permissive counterclaims is applicable to interpleader suits").

85.

St. Angelo does not qualify as an "Insured Person" under the Policy.

86.

St. Angelo has pleaded guilty to a federal charge of conspiracy to commit bank fraud and admitted a number of other facts which trigger exclusions in the Policy. *See* Plea Agreement **[P-27]**; Bill of Information for Conspiracy to Commit Bank Fraud and Notice of Forfeiture **[P-1]**; and *Factual Basis* **[P-28]**, in those proceedings entitled *United States of America v. Gregory St. Angelo*, United States District Court for the Eastern District of Louisiana, Criminal Docket No. 19-00055.

87.

St. Angelo was not entitled to receive any proceeds under the Policy for Defense Costs.

88.

Fugetta and Lulich, along with the other co-defendants other than St. Angelo, continue to accrue additional attorney's fees, which are covered under the Policy.

89.

St. Angelo should be ordered to return to Zurich any and all Defense Costs paid to him by Zurich, to be used for the benefit of Fugetta, Lulich, and the others who were actually insured by the Policy.

**CLAIMS FOR RELIEF**

**COUNT I – DECLARATORY JUDGMENT**

90.

Plaintiffs-in-counterclaim hereby incorporate the allegations set forth in paragraphs 1 through 89 as if fully set forth herein.

91.

Plaintiffs-in-crossclaim pray that this Court declare that St. Angelo is not an Insured Person under the Policy.

## COUNT II --  UNJUST ENRICHMENT

92.

Plaintiffs-in-counterclaim hereby incorporate the allegations set forth in paragraphs 1 through 89 as if fully set forth herein.

93.

St. Angelo gained a financial advantage to which he was not legally entitled through his admitted illegal actions.

94.

Plaintiffs in crossclaim pray that St. Angelo be ordered to repay to Zurich any amounts to which he received from Zurich while he was not an Insured Person under the Policy.

## COUNTERCLAIMS

95.

AND NOW, through undersigned counsel, come Fugetta and Lulich now made Plaintiffs-in-counterclaim, against Plaintiff now made Defendant-in-counterclaim, who respectfully aver as follows.

### *Parties, Jurisdiction, and Venue*

96.

Fugetta, Plaintiff-in-counterclaim, is an individual of the age of majority who is domiciled in Louisiana.

97.

Lulich, Plaintiff-in-counterclaim, is an individual of the age of majority who is domiciled

in Louisiana.

98.

Zurich, Defendant-in-counterclaim is a New York Corporation engaged in the insurance

business with a statutory home office located at 4 World Trade Center, 150 Greenwich Street, New

York, New York 10007, and its principal place of business at 1299 Zurich Way, Schaumburg,

Illinois 60196.

99.

First NBC Bank Holding Company filed a Voluntary Petition under Chapter 11 of the

Bankruptcy Code on May 11, 201 7, in the United States Bankruptcy Court for the Eastern District

of Louisiana (No. 17-11213).

100.

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334, Federal

Rule of Bankruptcy Procedure 7013 and Federal Bankruptcy Rule of Procedure 7022.

101.

Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

102.

The statutory bases for the relief of the causes herein are 28 U.S.C. §1335 (the Federal

Interpleader Statute), where Plaintiffs'-in-counterclaim compulsory counterclaims must be plead

pursuant to Fed. R. Bankr. P. 7013,[2] and 28 U.S.C. §2201 (the Declaratory Judgment Act).

---

[2] *See New York Life Ins. Co. v. Deshotel*, 946 F.Supp. 454, 461 (E.D. La. 1996) ("It now seems
settled that (Fed. R. Civ. P.) Rule 13 which provides for compulsory and permissive counterclaims
is applicable to interpleader suits").

*Facts*

103.

Zurich issued a Financial Institution Select Insurance Policy to First NBC Bank Holding Company, No. DOP93 1 1203-04, with a policy period of 06/09/2015 to 06/09/2016, which includes a Management Liability Coverage Part with an aggregate limit of liability of $15 million (the "Policy").

104.

Plaintiffs-in-counterclaim are Insureds under the Policy.[3]

105.

On or about August 2, 2018, Fugetta requested coverage under the Policy, through undersigned counsel, in a letter to Zurich's counsel.

106.

On or about June 18, 2019, Lulich requested coverage under the Policy, through undersigned counsel, in a letter to Zurich's counsel.

107.

To date, Zurich has made two payments to undersigned counsel.

108.

On or about December 13, 2018, Zurich sent undersigned counsel a check in the amount of $11,676.50, for reimbursement of fees and expenses on behalf of Fugetta.

109.

On or about February 18, 2020, Zurich sent undersigned counsel a check in the amount of $10,288.98, for reimbursement of fees and expenses on behalf of Lulich and Fugetta.

---

[3] See Complaint for Interpleader and for Declaratory Relief **[P-1]**, ¶ 32.

110.

To date, Fugetta has incurred $25,422.78 in attorney's fees and expenses, of which Zurich has only reimbursed $15,273.00.

111.

As of December 31, 2019, Lulich incurred $6,567.48 in attorney's fees and expenses, which Zurich has reimbursed.

112.

Each of Fugetta and Lulich continue to accrue additional attorney's fees, which are covered under the Policy.

## CLAIMS FOR RELIEF

## COUNT I – FUGETTA'S DEMAND FOR REIMBURSEMENT OF COVERED LOSS

113.

Plaintiffs-in-counterclaim hereby incorporate the allegations set forth in paragraphs 1 through 89 as if fully set forth herein.

114.

The Policy defines Loss as follows:

Loss means the total amount the Insureds become legally obligated to pay on account of Claims made against them for Wrongful Acts for which coverage applies, including, but not limited to, damages (including punitive, exemplary or multiple damages), judgments, any award of pre-judgment or post-judgment interest with respect to covered damages, settlements and **Defense Costs.**

115.

This Court has issued two Orders in the Chapter 11 bankruptcy proceeding regarding distribution of proceeds from the Policy. On January 26, 2018, the Court ordered that the "2016-2017 insurers" are to "comply with the terms of their respective policies, **including, without**

**limitation, to advance, reimburse or make payments on account to defense costs (including and without limitation attorney's fees and expenses)** and other Loss as defined in the respective policies" (Case 17-11213, [P-325]) (emphasis added).

116.

Fugetta is entitled to reimbursement for all the Defense Costs incurred by him prior to August 2, 2018, which were not reimbursed to him under the Policy - a total of $9,887.50.

**COUNT II – DECLARATORY JUDGMENT**

117.

This Court issued a second Order on or about March 14, 2019 which provided that the "aggregate payments permitted under the policy shall be subject to a 'soft cap' of $9 million." Recently, a Motion has been filed in the Chapter 11 bankruptcy proceeding to increase the soft cap on attorney's fees from $9,000,000 to $12,000,000. Case No. 17-11213, [P-830].

118.

The proposed $12,000,000 soft cap has not been reached.

119.

Plaintiffs-in-counterclaim pray that this Court declare that Plaintiffs-in-counterclaim are entitled to reimbursement for all Defense Costs incurred by Plaintiffs-in-counterclaim from January 1, 2020 forward.

**WHEREFORE**, Defendants, Frank Fugetta and Michael Lulich, pray that their Answer be deemed good and sufficient and, after due proceedings herein, that there be judgment in their favor and against Gregory St. Angelo, denying Gregory St. Angelo reimbursement under the Policy and ordering Gregory St. Angelo to return all fees under the Policy that have been advanced

to him to date, and awarding Policy proceeds to Frank Fugetta and Michael Lulich, to the extent required under the Policy;

**FURTHER,** Plaintiffs-in-Crossclaim, Frank Fugetta and Michael Lulich, pray that these Crossclaims be entered against Gregory St. Angelo, and after due proceedings herein, that there be judgment rendered in favor of Plaintiffs-in-Crossclaim declaring that Gregory St. Angelo is not an Insured Person under the Policy and for judgment against St. Angelo ordering Gregory St. Angelo to return all fees under the Policy that have been advanced to him to date;

**FURTHER,** Plaintiffs-in-counterclaim, Frank Fugetta and Michael Lulich, pray that these Counterclaims be entered against Defendant-in-counterclaim, Zurich American Insurance Company, and after due proceedings herein, that there be judgment rendered in favor of Plaintiffs-in-counterclaim for reimbursement of all outstanding Defense Costs not yet reimbursed to them under the Policy, and for declaratory judgment in favor of Plaintiffs-in-counterclaim that Plaintiffs-in-counterclaim are entitled to reimbursement for all prospective Defense Costs incurred by Plaintiffs-in-counterclaim, from the Policy proceeds; and

**FURTHERMORE,** Frank Fugetta and Michael Lulich pray for all other general, equitable, and legal relief to which they may be entitled.

RESPECTFULLY SUBMITTED,

THE DERBES LAW FIRM, LLC

*/s/ Eric J. Derbes*
ERIC J. DERBES (La. Bar Roll No. 23464)
ALBERT J. DERBES, IV (La. Bar Roll No. 20164)
BRYAN J. O'NEILL (La. Bar Roll No. 37250)
3027 Ridgelake Drive
Metairie, LA 70002
Phone: (504) 837-1230
Fax: (504) 832-0323
Email: EDerbes@derbeslaw.com
*Attorneys for Frank Fugetta and Michael Lulich*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| UNITED STATES OF AMERICA | * | CRIMINAL NO. 19-55 |
|---|---|---|
| **v.** | * | SECTION: "J": |
| GREGORY ST. ANGELO | * | |

*   *   *

## FACTUAL BASIS

1. The Defendant, **GREGORY ST. ANGELO** (hereinafter "**ST. ANGELO**"), has indicated that he intends to plead guilty as charged to Count One, that is, conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349, of the Bill of Information pending against him.

2. The United States and **ST. ANGELO** do hereby stipulate and agree that the allegations in the Bill of Information and the following facts are true and correct and that, should this matter have proceeded to trial, the Government would have proven them beyond a reasonable doubt, through the introduction of competent testimony and admissible tangible and documentary exhibits. This Factual Basis does not attempt to set forth all of the facts known to the United States at this time. The limited purpose of this Factual Basis is to demonstrate that there exists a sufficient legal basis for **ST. ANGELO**'s guilty plea. By their signatures below, the parties expressly agree that there is a factual basis supporting the Defendant's guilty plea. The parties also agree that this Factual Basis may, but need not, be used by the United States Probation Office and the Court in determining the applicable advisory guideline range under the United States Sentencing Guidelines or the appropriate sentence under 18 U.S.C. § 3553(a).

Page 1 of 22

AUSA<br>
Defendant<br>
Defense Counsel

## I.    FIRST NBC BANK

3.      At all times material to the Bill of Information, First NBC Bank was a financial institution, as defined in Title 18, United States Code, Section 20, and a member of the Federal Deposit Insurance Corporation ("FDIC") with federally insured deposit accounts.

4.      First NBC Bank was established in or about 2006, with its headquarters in New Orleans, Louisiana, within the Eastern District of Louisiana, and with branch offices in Louisiana, Mississippi, and Florida.

5.      First NBC Bank was the wholly-owned subsidiary of First NBC Bank Holding Company. Beginning in May 2013, First NBC Bank Holding Company was a publicly-traded company listed on the NASDAQ stock exchange. On April 28, 2017, First NBC Bank was closed by the Louisiana Office of Financial Institutions ("LOFI").

6.      Bank President A was a founder of First NBC Bank and acted as its president and Chief Executive Officer from on or about May 2006, until on or about December 2016.

7.      From in or around 2006 through April 2017, Bank Officer B was employed by First NBC Bank as its Chief Credit Officer, and was responsible for, among other things, the overall quality of the bank's lending function; the bank's credit policies and administration; its loan recovery and collection efforts; and its monitoring and managing of past due loans, including the approval of the bank's internal list of past due loans.

8.      As a financial institution, First NBC Bank was subject to regulatory supervision by the FDIC and LOFI, charged with supervising and regulating First NBC Bank to ensure that it engaged in safe and sound banking practices and complied with federal and state banking laws.

AUSA
Defendant
Defense Counsel

9.     First NBC Bank was also required to submit to periodic safety and soundness examinations conducted by the FDIC and LOFI. First NBC Bank was required to report information regarding past due loans to the FDIC and LOFI in advance of these examinations, which affected the regulators' conclusions regarding the First NBC Bank's financial condition.

10.     In addition, First NBC Bank engaged external auditors tasked with evaluating the accuracy of the bank's financial statements related to, among other things, the bank's loan portfolio and investments.

## II.     ST. ANGELO'S RELATIONSHIP WITH FIRST NBC BANK

11.     At all times material to the Bill of Information, the Defendant, **ST. ANGELO**, was an attorney and resided in St. Tammany Parish, which is within the Eastern District of Louisiana. **ST. ANGELO** was a member, owner, or otherwise exercised control of the following entities, among others, all of which were Louisiana business entities: St. Angelo Investment Company, LLC; Premier Information Systems, Inc.; St. Fitz, LLC; 616 Girod, LLC; LMH Properties, LLC; Lismore Properties, LLC; Conti Development, LLC; La Nasa, St. Angelo & La Nasa, LLC; and Annadele, Inc. (collectively "the Entities").

12.     From in or around 2006, through April 2017, **ST. ANGELO** had a banking relationship with First NBC Bank individually and through some of the Entities. **ST. ANGELO** obtained loans at First NBC Bank through various other individuals and businesses as nominees (the "Nominee Loans") and used the loan proceeds for **ST. ANGELO**'s and the Entities' benefit, and sometimes for the benefit of nominees.

AUSA
Defendant
Defense Counsel

13.     At a time unknown but prior to in or around July 2009, through in or around September 2016, Bank President A acted as the loan officer for **ST. ANGELO**, the Entities, and some of the Nominee Loans.

14.     From in or around September 2006 through in or around September 2016, **ST. ANGELO** was the general counsel of First NBC Bank, providing general legal advice and services, including, but not limited to transactional work, legal research, litigation, and collections. In or around September 2016, **ST. ANGELO**'s contract with First NBC Bank was allowed to expire.

15.     By the time First NBC Bank failed in late April 2017, the balances on the loans issued to **ST. ANGELO** and the Entities, totaled approximately $46.7 million. In addition, by the time First NBC Bank failed, it had paid **ST. ANGELO** approximately $9.6 million for purported tax credit investments.

### III.     THE BANK FRAUD CONSPIRACY

16.     Beginning at a time unknown to the United States Attorney, but no later than September 2006, through in and around April 2017, in the Eastern District of Louisiana and elsewhere, **ST. ANGELO** and others known and unknown to the United States Attorney, did knowingly and willfully combine, conspire, confederate, and agree to commit offenses against the United States of America, that is: to knowingly and with intent to defraud, execute and attempt to execute a scheme and artifice to defraud First NBC Bank, a financial institution, and to obtain any of the moneys, funds, credits, and assets, owned by, and under the custody or control of First NBC Bank, by means of false and fraudulent pretenses, representations, and promises, relating to a material fact, in violation of Title 18, United States Code, Section 1344.

AUSA
Defendant
Defense Counsel

## IV.  MANNER AND MEANS OF THE CONSPIRACY

17.    The manner and means by which **ST. ANGELO**, Bank President A, and others sought to accomplish the purpose of the conspiracy included the following:

18.    Bank President A, Bank Officer B, and others disguised **ST. ANGELO**'s and the Entities' true financial condition by renewing and increasing loans and lines of credit, paying off matured loans with new loans, making loan payments with loan proceeds, and using loan proceeds to cover overdrafts. This practice made it falsely appear that **ST. ANGELO**'s and certain Entities' loans were performing.

19.    **ST. ANGELO**, Bank President A, Bank Officer B, and others provided First NBC Bank with materially false and fraudulent financial statements, collateral summaries, and other documents that, among other things, overstated the value of **ST. ANGELO**'s and the Entities' assets and understated their liabilities. The materially false and fraudulent financial statements, collateral summaries, and other documents disguised **ST. ANGELO**'s and the Entities' true financial condition.

20.    **ST. ANGELO** and Bank President A also caused First NBC Bank to make two loans to **ST. ANGELO** for the purpose of renovating properties 4 Everett Place and 618 Conti Street, in New Orleans, when in fact those proceeds were used to pay some overdrafts in **ST. ANGELO**'s or the Entities' accounts at First NBC Bank and to pay **ST. ANGELO**'s personal expenses.

21.    **ST. ANGELO** and his co-conspirators obtained loans for individuals associated with **ST. ANGELO** as nominees ("the Nominee Loans"). These Nominee Loans benefitted **ST. ANGELO** and the nominees. Under this scheme, the nominees signed loan paperwork making

AUSA
Defendant
Defense Counsel

it appear that the nominee was taking out the loan. In fact, some proceeds from the Nominee Loans were used by **ST. ANGELO**, not the nominees, to pay **ST. ANGELO**'s existing debts to First NBC Bank for his and the Entities' expenses. **ST. ANGELO**, Bank President A, and Bank Officer B caused representatives of First NBC Bank to transfer the Nominee Loan proceeds to the Entities' deposit accounts.

22.     Bank President A, **ST. ANGELO**, Bank Officer B, and others created fake tax credit investments that First NBC Bank made in entities owned or purportedly owned by **ST. ANGELO**. In reality, Bank President A, **ST. ANGELO**, Bank Officer B, and others designed the fake tax credit investments to funnel money from First NBC Bank's general ledger to **ST. ANGELO** and the Entities, so he could make loan payments and cover overdrafts.

### A.  False Risk Ratings

23.     Bank President A, Bank Officer B, and others created and placed in First NBC Bank's books and records of false credit memoranda, collateral summaries, and other documents related to **ST. ANGELO**'s and the Entities' loans. In reality, Bank President A, Bank Officer B, and others knew that **ST. ANGELO**'s true debts to First NBC Bank and others were far higher than reported on bank documents. They likewise knew that the collateral statements regarding **ST. ANGELO**'s and the Entities' loans falsely overstated the value of certain assets, including tax credit investments.

24.     **ST. ANGELO** and the Entities were regularly overdrawn on one or more First NBC Bank checking accounts each month, despite the fact that his monthly retainer at First NBC Bank rose steadily from $3,500 per month in 2006 to $40,000 a month in 2015, and First NBC paid him legal fees beyond the monthly retainer. Bank President A and Bank Officer B used **ST.**

AUSA
Defendant
Defense Counsel

ANGELO's cash flow from his legal practice to justify additional loans to **ST. ANGELO** and the Entities. Nevertheless, all of these retainer payments went into **ST. ANGELO**'s accounts at other banks, and very few were used to make loan payments. Bank President A and Bank Officer B were aware that **ST. ANGELO** did not use his retainer to pay his loan payments and kept this income at other banks.

25.     In addition to overdrafts in the Entities' accounts, **ST. ANGELO** and the Entities owed First NBC Bank monthly loan payments on his, the Entities', and the Nominee Loans that totaled in the hundreds of thousands of dollars each month. Bank Officer B and others regularly received written reports from bank employees tracking overdrafts and month-end payments due from **ST. ANGELO**, the Entities, and nominees. Bank President A, Bank Officer B, and **ST. ANGELO** frequently discussed **ST. ANGELO**'s inability to service the debt. This was, in part, because of bad loans that **ST. ANGELO** took on, at the request of Bank President A and Bank Officer B, in order to improve the overall asset quality of the bank.

26.     On or about June 26 and 27, 2011, Defendant **ST. ANGELO**, Bank Officer B, and Bank President A, emailed about **ST. ANGELO** being unable to repay approximately $800,000 in overdrafts and loan payments by month-end. **ST. ANGELO** sent Bank Officer B and Bank President A a document purporting to memorialize an agreement in 2008 between **ST. ANGELO** and Individual Y to extinguish debt **ST. ANGELO** owed to Individual Y in exchange for 36 postdated checks, each for $100,000. **ST. ANGELO** wrote, "I'm sending this to you now in the event that you need to document anything for the Board." Bank Officer B responded by asking if Individual Y had agreed to cover **ST. ANGELO**'s $800,000 payments due in four days. **ST. ANGELO** then wrote that Individual Y required another series of postdated checks, as well as a

AUSA
Defendant
Defense Counsel

meeting with Bank President A to ensure First NBC Bank would honor **ST. ANGELO**'s postdated checks. As a result, **ST. ANGELO** wrote, "You, [Bank President A], and I should probably meet to decide whether or not that is the best course of action. We all know that my cash flow can not support $100,000 payments. Do we really want to commit to another year's worth of overdrafts? There may be some better options out there. Let's discuss."

27. On or about June 28, 2011, Bank Officer B emailed Bank President A stating that he was sitting with **ST. ANGELO** "trying to come up with a solution for his month-end overdrafts" of approximately $800,000. Bank Officer B referenced an earlier discussion between Bank President A and **ST. ANGELO**, in which Bank President A stated he did not want Individual Y to advance **ST. ANGELO** the money to cover overdrafts. Bank Officer B then asked Bank President A, "Any thoughts?" Two days later, Bank President A authorized a new Nominee Loan for $500,000 falsely stating the proceeds would "fund the build out of check cashing outlets." First NBC Bank then deposited $499,750 of the loan proceeds into one of the Entities' accounts. The same day, Bank President A authorized a new loan to **ST. ANGELO** for $500,000 falsely stating the proceeds would be used to "redevelop [] of 616 Girod." These two loans covered the overdraft and past due loan payments for **ST. ANGELO**, the Entities, and Nominee Loans at month-end.

28. On or about November 28, 2011, a First NBC Bank employee emailed Bank Officer B a list of loans that had matured in October 2011. The email included loans, totaling approximately $2.3 million, where the listed borrowers were Nominee A and Nominee B. The email described those loans, as well as others in the name of other nominees, as "Greg affiliated." Bank President A was listed as the loan officer on one of the loans held in the name of Nominee B. Despite knowing that **ST. ANGELO** was responsible for repaying these Nominee Loans, Bank

AUSA
Defendant
Defense Counsel

President A and Bank Officer B caused these loans to be omitted from the credit package describing **ST. ANGELO**'s financial status, thereby disguising his true financial position.

29.     On or about September 29, 2013, a bank employee sent an email after 9 p.m. to Bank President A and Bank Officer B alerting them that **ST. ANGELO**'s and certain of the Entities' overdrafts and loan payments totaled approximately $497,208. The bank employee asked whether Bank President A would be waiving the $48,977.37 in late charges. Bank President A approved an additional $1 million dollar loan for **ST. ANGELO** and the Entities to cover the overdrafts and loan payments. Bank President A stated that the loan consolidation needed to close by the last day of the month so that **ST. ANGELO** and the Entities would not be on the month-end past due or overdraft reports.

30.     In mid-March 2015, a bank employee emailed Bank Officer B that **ST. ANGELO** and certain of the Entities would owe approximately $648,983 by the end of March. Upon receiving this email, Bank Officer B immediately emailed **ST. ANGELO**, "You are approaching $700M!!!" Shortly thereafter, First NBC Bank originated a $1 million loan to cover the overdraft with the stated purpose of "working capital."

## B.  False Personal Financial Statements

31.     **ST. ANGELO** and Bank President A annually submitted false personal financial statements to First NBC Bank in support of **ST. ANGELO** and the Entities' loans. These personal financial statements overstated his assets and understated his liabilities. The purpose of creating false personal financial statements was to "paper" **ST. ANGELO** and the Entities' loan files to mislead the FDIC and LOFI examiners into thinking that **ST. ANGELO**'s net worth was greater than it was.

AUSA
Defendant
Defense Counsel

32.     Despite their awareness of **ST. ANGELO**'s cash flow shortfall and outside debt service, Bank Officer B continued to give **ST. ANGELO**'s loan an average risk rating. Bank President A and Bank Officer B knew this risk rating was false and continued using it to conceal the condition of **ST. ANGELO**'s and the Entities' loans.

33.     In a personal financial statement dated July 27, 2015, **ST. ANGELO** overstated real estate owned and the value of his law practice and business, Premier Information Systems, by more than $1 million. The 2015 personal financial statement was included in First NBC Bank's books and records to support loan advances approximately six times. The 2015 personal financial statement did not disclose liabilities associated with Nominee Loans, which totaled approximately $19 million, at the end of 2014. Nor did it include a mortgage of $1.5 million on the building located at 618 Conti Street. The personal financial statements used appraised values that **ST. ANGELO**, Bank President A, and others knew were not current. It also omitted certain assets and other material information. **ST. ANGELO**, Bank President A, and others knew that information in the 2015 personal financial statement was false.

34.     For example, in the 2015 personal financial statement, **ST. ANGELO** listed as an asset, the building at 622 Conti Street as having a value of $7 million. He also listed the building at 616 Girod as having a value of $2.3 million. **ST. ANGELO** knew that these statements were false because six months earlier, Bank Officer B emailed **ST. ANGELO** appraisals for 616 Girod and 622 Conti. The values were much lower. The appraiser had valued 616 Girod at $1.6 million and 622 Conti at $2.2 million. Bank Officer B stated in the email "Sit down and read below. Maybe a stiff drink will help." **ST. ANGELO** responded "1.) I hope the credit will be reviewed [by the examiners] before [the appraisal] arrives; and 2.) [Bank President A] is going to shred [the

AUSA
Defendant
Defense Counsel

appraiser].” Despite this knowledge, **ST. ANGELO** signed the 2015 personal financial statement certifying its accuracy.

### C. **False Statements About Loan Purposes**

35.    In addition to presenting false personal financial statements to First NBC Bank, Bank President A, Bank Officer B, **ST. ANGELO**, and others executed loan documents knowing the stated purpose was false. For example, in or around November 30, 2015, Bank President A approved a loan ending in 3995 to St. Angelo Investment Company, LLC for $1 million. The stated purpose of the loan was to finance the renovation of 4 Everett Place, and the building located at 618 Conti Street. The initial $592,000 disbursement on the loan covered $166,483 in overdrafts to **ST. ANGELO**’s deposit account ending in 1455. With the exception of two payments totaling approximately $48,975, which went toward the construction of 4 Everett Place, **ST. ANGELO** used the loan proceeds to pay additional overdrafts and finance personal expenses. After the initial disbursement on this loan, Bank President A approved incremental increases on the loan five times in a six-month period. By June 2016, Bank President A had approved funding the loan for $4 million, and First NBC Bank had disbursed approximately $3.9 million to **ST. ANGELO**’s entity, St. Angelo Investment Company, LLC for the same stated reasons: working capital associated with expenses on 4 Everett Place and 618 Conti Street. In fact, **ST. ANGELO** only used a small percentage of the loan for its intended purpose. He continued to use the proceeds to pay overdrafts, stay current on other loans, pay nominees, fund his personal bank account at JPMorgan Chase, and finance personal expenditures that his salary and income alone could not cover.

36.    On or about January 28, 2016, **ST. ANGELO**’s First NBC Bank account ending in 1455 was overdrawn by $344,952 due, in part, to checks he wrote to Nominee A for $111,120,

AUSA

Defendant

Defense Counsel

Nominee C for $169,910, and himself for $98,600. On or about January 29, 2016, Bank President A approved another loan ending in 8978 to **ST. ANGELO**'s entity, 616 Girod, LLC, for $715,000. The loan documents falsely stated that the purpose was to renovate 4 Everett Place. First NBC Bank disbursed $665,168 of loan proceeds into the account ending in 1455, and none of the proceeds were used to renovate 4 Everett Place. **ST. ANGELO** used $289,874 to pay other First NBC Bank loans and $372,952 to cover overdrafts at First NBC Bank and elsewhere, including the $98,600 check deposited into his JPMorgan Chase account. At the time, his JPMorgan Chase account balance was negative $57,012.28, caused, in part, by personal expenses. Over the next nine months, Bank President A increased the loan twice until it reached approximately $2,215,000 and was fully disbursed. The purpose of the loan changed to "working capital to purchase Our Lady of Lourdes Church on 2400 Napoleon Avenue." A significant portion of the proceeds of this loan was used for purposes unassociated with the stated purpose of the loan, including payments to certain nominees, and payments to Individual Y.

### D.  Nominee Loans

37.      Between 2006 and 2017, Bank President A, Bank Officer B, and others conspired with **ST. ANGELO** to permit him to use Nominee Loan proceeds to cover his and his Entities' loan payments and overdrafts. It was part of the scheme that **ST. ANGELO**'s associates would obtain loans as nominee borrowers. The Nominee Loans, in fact, benefitted **ST. ANGELO**, who used the Nominee Loan proceeds to pay his overdrafts or existing debts to First NBC Bank and others. The Nominee Loans also benefitted First NBC Bank because they were used, at times, to prop-up other troubled borrowers to allow the bank to avoid downgrading the loans or reporting them as impaired. Bank President A and Bank Officer B were aware that the Nominee Loans

AUSA
Defendant
Defense Counsel

benefitted **ST. ANGELO** and the bank by hiding the true condition of **ST. ANGELO**'s and the Entities' loans, as well as the true financial condition of other troubled borrowers.

### E.   False Tax Credit Investments

38.     Under federal law governing historic tax credits, an owner of real estate is eligible to receive tax credits on certain historic properties. In order to qualify for federal historic tax credits for a commercial property, an individual or entity must own the property in question or be the long-term lessor for a term exceeding 39 years after the date the property is placed in commerce. If an entity qualifies for tax credits, it can use the credits to offset its tax liability in future years. First NBC Bank could benefit from the tax credit offset only by becoming a member of the entity entitled to the credit.

39.     Beginning at a time unknown but in or around July 2010, **ST. ANGELO**, Bank President A, and Bank Officer B conspired to cause First NBC Bank to disburse money to **ST. ANGELO** and/or the Entities under the guise that the bank was investing in tax credits that **ST. ANGELO** or the Entities owned. In reality, neither **ST. ANGELO** nor the Entities ever earned any tax credits, and First NBC Bank never had any basis to obtain any tax credits from **ST. ANGELO**'s or the Entities' properties. **ST. ANGELO** and Bank President A created fraudulent documents, regarding the false tax credit scheme, that were placed in First NBC Bank's records. The true purpose of the false tax credit investments was to funnel money to **ST. ANGELO** and the Entities to repay outstanding loan balances and overdrafts, and avoid downgrading, classifying, or reporting **ST. ANGELO**'s and the Entities' loan relationships as losses for the bank. The false tax credit scheme also allowed Bank President A to circumvent the bank's normal credit underwriting and approval process.

Page **13** of **22**

AUSA _____
Defendant _____
Defense Counsel _____

*622 Conti Street*

40.     On or about March 12, 2004, when **ST. ANGELO** performed legal services for First Bank and Trust, he entered a 30-year lease agreement to lease the building located at 622 Conti Street in the French Quarter through his entity St. Angelo Investment Company. At the time, Bank President A was the president of First Bank & Trust and suggested that **ST. ANGELO** take over the lease from the prior tenant who was in default of the lease agreement. Bank President A told **ST. ANGELO** he could make a lot of money by leasing the building.

41.     From on or about April 26, 2006 through in or around 2018, **ST. ANGELO** was often in default of the lease terms and was notified in writing by the owners, an entity called 622 Conti, LLC, that he was in breach. **ST. ANGELO** repeatedly entered into negotiations with 622 Conti, LLC to avoid eviction. Neither **ST. ANGELO** nor the Entities ever owned 622 Conti Street or were members of 622 Conti, LLC.

42.     Starting in 2010, **ST. ANGELO**, Bank President A, and Bank Officer B began transferring First NBC Bank funds to **ST. ANGELO** based on fake tax credit investments First NBC Bank purportedly made to renovate the 622 Conti building. At this time, **ST. ANGELO** and the Entities' annual debt service to First NBC Bank was $888,805, and his total loan balance at First NBC Bank was approximately $12 million. These figures exclude debt service on the Nominee Loans. Further, the Entities' deposit accounts were regularly overdrawn at this time.

43.     To address **ST. ANGELO**'s growing overdraft and cash flow problems, Bank President A and **ST. ANGELO** began using fake tax credit investments to use bank money to pay **ST. ANGELO's** and the Entities' overdrafts and loan payments.

Page **14** of **22**

AUSA
Defendant
Defense Counsel

44.     For example, in July 2010, **ST. ANGELO**'s Premier Information Systems checking account #***1180 was overdrawn by approximately $484,752.63. On or about July 30, 2010, Bank President A, Bank Officer B, and **ST. ANGELO** caused the general ledger of First NBC Bank to be debited by $500,000, using a debit ticket that read, in part, "Inv. Int 622 Conti LLC" and "Per [Bank Officer B]." The misleading phrase "Inv. Int 622 Conti LLC" referred to the source of the funds. That same day, $500,000 was credited to **ST. ANGELO**'s Premier Information Systems checking account #***1180 using a credit ticket that read, in part, "From Inv Int 622 Conti LLC...per [Bank Officer B]." These funds were not used toward First NBC Bank's investment in 622 Conti LLC. Rather, the funds covered the $484,752.63 in overdrafts that **ST. ANGELO** and the Entities had incurred in July 2010 and made **ST. ANGELO**'s and the Entities' loan payments. This transaction made it appear that **ST. ANGELO**'s or the Entities' loans were performing and his accounts were current.

45.     On or about August 12, 2010, **ST. ANGELO**'s Premier Information Systems checking account #***1180 was overdrawn by $258,202.84. The account had become overdrawn because, among other things, **ST. ANGELO** wrote a $69,568.29 check to another bank for loan payments; a $6,670.11 check to that same bank for loan payments, with memo line "[Nominee A] payment"; and a $2,154.24 check to the same bank for loan payments. Each of these items was paid on or about August 2, 2010, causing account #***1180 to become overdrawn. In addition, the account was overdrawn because **ST. ANGELO** wrote a check on or about August 4, 2010 to himself for $38,400 and a $6,250 check on or about August 9, 2010 to Nominee A. On or about August 13, 2010, Bank President A, Bank Officer B, and **ST. ANGELO** caused the general ledger of First NBC Bank to be debited by $400,000, using a debit ticket that falsely read, in part, "Inv.

AUSA
Defendant
Defense Counsel

Int 622 Conti LLC" and "Per [Bank Officer B]." That same day, a $400,000 credit was added to **ST. ANGELO**'s Premier Information Systems checking account #***1180, reading, in part "Inv. Int. 622 Conti, LLC" and "Per [Bank Officer B]." These funds covered the $258,202.84 in overdrafts described above. In addition, on August 13, 2010 the funds paid $83,917.27 towards **ST. ANGELO**'s and the Entities' loans, using a debit ticket that read in part, "Per [Bank Officer B]."

46.     **ST. ANGELO**, Bank President A, and Bank Officer B expanded their false tax credit investment scheme by executing a series of false and fraudulent agreements to purchase tax credits for 622 Conti, LLC. These fake tax credit purchase agreements were designed to conceal the fact that Bank President A was funneling First NBC Bank funds to **ST. ANGELO** to cover his overdrafts and make loan payments. Beginning in late 2010, after the July and August 2010 payments, purportedly for tax credit investments, **ST. ANGELO** and Bank President A signed a document entitled "Agreement to Purchase Tax Credits, 622 Conti, LLC (revised)." The document referenced the July 2010 payment of $500,000 from First NBC Bank and the August 2010 payment of $600,000. **ST. ANGELO** further falsely signed the document as "Managing Member" of 622 Conti, LLC, even though he and Bank President A knew that **ST. ANGELO** was not, and never was, a member of 622 Conti, LLC. This fraudulent Agreement to Purchase Tax Credits, along with the debit and credit tickets described in paragraphs 44 and 45 above, were placed in the files of First NBC Bank.

47.     After **ST. ANGELO** and Bank President A executed this initial Agreement to Purchase Tax Credits relating to 622 Conti Street, Bank President A and **ST. ANGELO** executed seven additional false documents entitled "Agreement to Purchase Tax Credits" relating to 622

AUSA
Defendant
Defense Counsel

Conti Street, LLC. **ST. ANGELO** signed each of these documents, knowing that he was falsely signing as a member of 622 Conti, LLC and that based on his lease term, he was not entitled to claim any tax credits. Further, **ST. ANGELO** and Bank President A knew that the true purpose of the Agreements to Purchase Tax Credits was to funnel money to **ST. ANGELO** and not for any legitimate tax credit or investment purpose.

48.     In total, between July 2010 and June 2015, Bank President A and **ST. ANGELO** entered into eight agreements entitled "Agreement to Purchase Tax Credits" that purported to be investments in 622 Conti, LLC. The below disbursements were used cover overdrafts and loan payments:

| Date | Amount | Account Balance Prior to Funds |
|---|---|---|
| 7/30/2010 | $500,000.00 | ($484,752.63) |
| 8/13/2010 | $400,000.00 | ($258,201.84) |
| 8/31/2010 | $200,000.00 | ($87,878.47) |
| 10/29/2010 | $340,000.00 | ($517,765.39) |
| 7/29/2011 | $450,000.00 | ($167,274.77) |
| 8/31/2011 | $600,000.00 | ($302,046.45) |
| 9/30/2011 | $750,000.00 | ($442,507.93) |
| 10/31/2011 | $272,000.00 | deposited in nominee account |
| 7/31/2014 | $830,639.00 | ($468,765.23) |
| 8/29/2014 | $570,685.56 | ($278,851.52) |
| 9/30/2014 | $438,200.00 | ($437,292.29) |
| 10/31/2014 | $453,000.00 | ($171,865.90) |
| 11/25/2014 | $450,000.00 | ($139,201.16) |
| 12/23/2014 | $450,000.00 | ($1,104.67) |
| 2/13/2015 | $500,000.00 | $144,597.53 |
| 5/28/2015 | $315,732.00 | $10,829.65 |

49.     For each agreement listed above, bank records demonstrate that funds were debited from First NBC Bank's general ledger and transferred to **ST. ANGELO** or the Entities' First NBC

AUSA
Defendant
Defense Counsel

deposit accounts. These debits from the First NBC Bank general ledger were approved by Bank President A and Bank Officer B.

*The Addition of 616 Girod Street & Annadele*

50.     The tax credit fraud scheme expanded to involve two additional properties, a building at 616 Girod Street, in New Orleans, and a restaurant named "Annadele" on Chestnutt Street, in Covington. In or about November 2010, **ST. ANGELO** and Bank President A signed a document entitled "Agreement to Purchase Tax Credits 616 Girod, LLC and Annadele, LLC (revised)." The document stated that the two entities "will spend approximately $4,700,000 on the renovation of their respective buildings located at 616 Girod, New Orleans, Louisiana and 75418 Chestnut[]," that is, the Annadele property in Covington, Louisiana. This document purported to show that First NBC Bank would pay 616 Girod, LLC and Annadele, LLC $1,692,000 in exchange for a 99% ownership interest in these two entities for five years after the above-listed properties received certificates of occupancy. In fact, on or about March 17, 2016, **ST. ANGELO** sold the property located at 616 Girod Street, before First NBC Bank could claim the tax credits it had purchased under to the 2010 agreement. **ST. ANGELO** never applied for tax credits for either property.

51.     In total, Bank President A and **ST. ANGELO** executed three false tax credit purchase agreements that purported to be investments relating to Annadele and 616 Girod. However, the below disbursements were used to cover overdrafts and loan payments:

AUSA
Defendant
Defense Counsel

| Date | Amount | Acct Bal Prior to Funds |
|---|---|---|
| 9/30/2010 | $575,000.00 | ($373,671.62) |
| 10/29/2010 | $482,000.00 | ($517,765.39) |
| 11/30/2010 | $610,000.00 | ($408,465.81) |
| 2/28/2011 | $475,000.00 | ($290,889.68) |

*Knowledge that St. Angelo Could Not Claim Tax Credits on 622 Conti as Lessee*

52.    On or about December 28, 2010, First NBC Bank's outside counsel informed **ST. ANGELO** and Bank President A that the potential tax credits in 622 Conti, LLC, which First NBC Bank had supposedly sought to purchase, could not in fact be claimed, because **ST. ANGELO** neither owned the property nor had a long enough lease.

53.    In October of 2011, Bank President A submitted additional false documents to First NBC Bank based on the false representation that **ST. ANGELO** was entitled to tax credits for 622 Conti. On or about October 3, 2011, Bank President A authored a memorandum, with numerous false statements, concerning **ST. ANGELO**'s borrowing relationship with First NBC Bank, and he caused it to be placed in the loan files of First NBC Bank. These false statements included, among others, that **ST. ANGELO** had "earned historic tax credits of approximately $4,532,000 on the renovation of [622 Conti Street] (First NBC will purchase these credits for approximately $3,512,000 once the renovation is complete)." The memorandum further falsely stated that **ST. ANGELO**'s "collateral pool[] has been enhanced substantially by the value of the tax credits associated with the Conti and Girod renovation." In fact, Bank President A knew that First NBC Bank would be unable to use or claim the tax credits as an asset because **ST. ANGELO** was ineligible for the credits.

Page **19** of **22**

AUSA
Defendant
Defense Counsel

54.     On or about March 7, 2013, First NBC Bank's external auditors requested the operating agreement and cost certification for 622 Conti. In response, on March 19, 2013, Bank President A asked First NBC Bank's outside tax attorney to email a copy of an operating agreement between 622 Conti LLC and a First NBC Bank subsidiary, that she had previously drafted in 2010. On March 25, 2013, a First NBC Bank employee emailed **ST. ANGELO** a copy of Bank President A's handwritten edits to the operating agreement, dated December 1, 2010, in which Bank President A replaced 622 Conti, LLC with St. Angelo Investment Company, LLC.

55.     Shortly thereafter, an employee of First NBC Bank sent First NBC Bank's external auditors a falsified version of the 2010 operating agreement, purporting to be between the First NBC Bank subsidiary and St. Angelo Investment Company, LLC, except that one part of the document mistakenly left in the name of 622 Conti LLC. The falsified operating agreement provided to the external auditors was backdated to January 1, 2009 and was signed by Bank President A and **ST. ANGELO**. Bank President A backdated the operating agreement to make it appear that it was effective before First NBC Bank disbursed false tax credit money to **ST. ANGELO** in July 2010.

56.     In December of 2014 a First NBC Bank employee emailed Bank Officer B requesting permission to cover **ST. ANGELO**'s overdrafts with tax credit money. The employee asked Bank Officer B, "Are we out of tax credits for conti? Do you know?" Bank Officer B responded, "As long as we have a sharp pencil we are never out of tax credits," acknowledging that the tax credits were a fiction. The bank employee responded, "LOL…..I think that just made my day…." Approximately ten days later, Bank Officer B approved a credit to the 616 Girod

AUSA _____
Defendant _____
Defense Counsel _____

deposit account of approximately $450,000, which covered overdrafts to certain Entities and went to **ST. ANGELO's** personal account.

57.   On or about March 27, 2015, Bank President A's assistant emailed Bank Officer E, copying Bank President A, informing Bank Officer E an executed Agreement to Purchase Tax Credits for 622 Conti, LLC was attached. Bank President A's assistant stated "Bank President A would appreciate your sending this to the auditors." Later that day, Bank Officer E emailed the fraudulent Agreement to Purchase Tax Credits for 622 Conti, LLC to the auditors.

58.   In or around 2016, First NBC Bank's external auditors began loan reviews of **ST. ANGELO**, the Entities, and nominees. Specifically, they began to ask questions about the false investments in 622 Conti, LLC. On or about March 6, 2016, an auditor requested information from Bank President A about First NBC Bank's purported investment in 622 Conti. On that same date, Bank President A forwarded the email to **ST. ANGELO**. Six minutes later, **ST. ANGELO** responded, "I see that [Bank Officer C] is copied. I'm sure he isn't saying anything positive about it." At or about 3:00 AM on March 7, 2016, Bank President A responded, "You are totally paranoid. [The auditor] is dealing with me not [Bank Officer C] because I am the only one involved. They questioned that also and I explained that this was one of our first deals, we had no tax credit department, and each loan officer handled their own deal as part of the loan process."

59.   On or about March 21, 2016, an external auditor requested documents from a First NBC Bank employee, to review First NBC Bank's entire relationship with **ST. ANGELO**. The request specifically listed eleven loans, but asked for records for certain **ST. ANGELO** and nominee loans. On the same day, the auditor's request was forwarded to Bank Officer B. On or

Page **21** of **22**

AUSA _____
Defendant _____
Defense Counsel _____

about March 22, 2016, Bank Officer B forwarded the auditor's request to **ST. ANGELO**, saying "It had to happen. See below. [The audit firm] are now looking at you."

60.    Between July 2010 and April 28, 2017, when First NBC Bank was closed, Defendant **ST. ANGELO**, Bank President A, and others caused First NBC Bank to pay **ST. ANGELO** approximately $9.6 million, purportedly in exchange for tax credit investments in 622 Conti, Annadele, and 616 Girod, knowing that the bank was unable to realize the tax credits

61.    Various records, including income tax returns, IRS filing records, bank records, audio and video recordings, and documents and tangible objects would be introduced at trial to prove the facts as set forth above. In addition, the testimony of employees and agents of the Federal Bureau of Investigation, the Federal Deposit Insurance Corporation, Office of Inspector General, and other competent witnesses would be introduced at trial to prove the facts set forth above.

**APPROVED AND AGREED TO:**

_____          _____6/27/19_____
SHARAN E. LIEBERMAN                        Date
NICHOLAS D. MOSES
MATTHEW R. PAYNE
J. RYAN McLAREN
Assistant United States Attorneys

_____          _____6/28/19_____
PHILLIP WITTMANN                           Date
Attorney for Defendant St. Angelo

_____          _____6/27/19_____
PETER THOMSON                              Date
Attorney for Defendant St. Angelo

_____          _____6/27/19_____
GREGORY ST. ANGELO                         Date
Defendant

AUSA
Defendant
Defense Counsel