FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA.

2020 JUN 15 P 2: 13

CAROL L. MICHEL
CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**BILL OF INFORMATION FOR CONSPIRACY TO
COMMIT BANK FRAUD AND NOTICE OF FORFEITURE**

**FELONY**

**20-00053**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL DOCKET NO. |
| v. | * | SECTION: **SECT.GMAG.4** |
| ARVIND "MIKE" VIRA | * | VIOLATIONS:  18 U.S.C. § 371 |
| | * | 18 U.S.C. § 1344 |

\*     \*     \*

The First Assistant United States Attorney, Michael M. Simpson, as the Attorney for the

United States, acting on the authority conferred by Title 28, United States Code, Section 515,

(hereinafter, "the Attorney for the United States") charges that:

### COUNT 1
(Conspiracy to Commit Bank Fraud)

**A.    AT ALL MATERIAL TIMES HEREIN:**

1.    First NBC Bank was a financial institution, as defined in Title 18, United States

Code, Section 20, and a member of the Federal Deposit Insurance Corporation ("FDIC") with

federally insured deposit accounts. First NBC Bank ("the Bank") was established in or about 2006,

with its headquarters in New Orleans, Louisiana, within the Eastern District of Louisiana. At

various times, First NBC Bank maintained branch offices in Louisiana, Mississippi, and Florida.

Fee ___
Process ___
Dkt ___
CtRm ___
Doc ___



GOVERNMENT
EXHIBIT
A

2. First NBC Bank was the wholly-owned subsidiary of First NBC Bank Holding Company. Bank President A was a founder of First NBC Bank and acted as its president and Chief Executive Officer from in or around May 2006, until in or around December 2016.

3. In or around May 2013, First NBC Bank Holding Company became a publicly-traded company listed on the NASDAQ.

4. On or about April 28, 2017, the Bank was closed by the Louisiana Office of Financial Institutions. The FDIC was named Receiver.

5. The defendant, **ARVIND "MIKE" VIRA ("VIRA")**, was a businessman who resided within the Eastern District of Louisiana. **VIRA** owned hotels and was a borrower at the Bank from at least June of 2008 until the bank closed in 2017.

6. Over the course of his relationship with the Bank, **VIRA** provided loans to Bank President A, some of which were derived from loan proceeds that **VIRA** received from the Bank. At Bank President A's instruction, **VIRA** concealed from Bank employees the fact that he gave loans to Bank President A. **VIRA** also did not disclose that he had made loans to Bank President A in his personal financial statements, which he submitted to the Bank.

7. Bank President A ensured that **VIRA** received beneficial treatment from the Bank. Bank President A authorized low interest rates on loans that **VIRA** received from the Bank, and Bank President A authorized high interest rates on savings and checking accounts for **VIRA** and his family members.

8. **VIRA** also obtained loans from the Bank by providing the Bank with false material information in support of his loans, such as by inflating the value of his accounts at other banks and misrepresenting the amount of real estate he owned. **VIRA** provided this false information at the direction of Bank President A.

9.      By the time the Bank failed in late April 2017, the balances on loans issued to **VIRA** totaled over $39 million.

10.     As of March 2020, Bank President A personally owed **VIRA** approximately $2,750,000.00, not including accrued interest.

### B.     THE CONSPIRACY:

Beginning at a time unknown to the Attorney for the United States, but at least in or around April 2010, through in and around April 2017, in the Eastern District of Louisiana and elsewhere, the defendant, **ARVIND "MIKE" VIRA,** and others known and unknown to the Attorney for the United States, did knowingly and willfully combine, conspire, confederate, and agree to commit offenses against the United States of America, that is: to knowingly and with the intent to defraud, execute and attempt to execute a scheme and artifice to defraud First NBC Bank, a financial institution, and to obtain any of the moneys, funds, credits, and assets, owned by and under the custody or control of First NBC Bank, by means of false and fraudulent pretenses, representations, and promises, relating to a material fact, in violation of Title 18, United States Code, Section 1344.

### C.     PURPOSE OF THE CONSPIRACY:

The purpose of the conspiracy was for the defendant, **ARVIND "MIKE" VIRA,** and Bank President A to secure nominee loans for Bank President A and conceal the banking relationship between **VIRA** and Bank President A from First NBC Bank and others.

### D.     OVERT ACTS:

The defendant, **ARVIND "MIKE" VIRA,** and Bank President A committed overt acts in furtherance of the conspiracy. These overt acts include, among others, the following:

1.      On or about September 21, 2009, Bank President A approved a $5,000,000.00 increase on a **VIRA**'s revolving line of credit from the Bank.  The purpose of the loan was identified as working capital for investment properties. On or around April 26, 2010, Bank

President A requested **VIRA** loan him $400,000.00. **VIRA** provided these funds from his First NBC revolving line of credit. Bank President A then caused a $400,000.00 advance from **VIRA**'s revolving line of credit to be issued to Lake Forest Plaza LLC, a company owned by Bank President A. Bank President A used the funds to pay property taxes owed by Lake Forest Plaza LLC. Bank President A agreed to pay **VIRA** an annual interest rate of 6% on the loan. At the instruction of Bank President A, **VIRA** did not disclose this loan relationship to Bank employees. Bank President A did not disclose this business relationship to the Board, auditors, or regulators.

2.      On or about January 4, 2011, Bank President A approved a 3% interest rate for **VIRA**'s premier checking account.

3.      On or about May 2, 2011, Bank President A signed off on a loan package for **VIRA** as an additional approving officer for the Bank. The package renewed **VIRA**'s prior loan and increased it by $1,000,000.00.

4.      On or about May 10, 2011, Bank President A approved a 3% interest rate on four new checking accounts opened by **VIRA**.

5.      On or about July 7, 2011, the Bank's Board Loan Committee, with Bank President A participating, approved an unsecured $9,000,000.00 revolving line of credit to **VIRA**, with the stated purpose of providing working capital for investment purposes. On or around November 17, 2011, **VIRA** loaned Bank President A $2,000,000.00 from the revolving line of credit. As collateral for this loan, Bank President A pledged to **VIRA** five certificates representing 275,000 shares of the Bank's stock. Bank President A agreed to pay **VIRA** an annual interest rate of 8% on the loan.

6.      During the December 2012 FDIC examination, FDIC examiners discovered the November 2011 transaction and cited Bank President A for violations of federal banking

regulations. Bank President A lied to the examiners by stating that he was unaware that **VIRA** had used his revolving line of credit at the Bank to fund the personal loan to Bank President A. Bank President A told examiners that when **VIRA**'s revolving line of credit was approved, he had no idea that he would be borrowing from **VIRA** in the future. During the interview, Bank President A also never disclosed to the FDIC examiners that he had previously borrowed $400,000.00 from **VIRA**'s revolving line of credit.

7.       After Bank President A's meeting with FDIC examiners during the December 2012 examination, Bank President A had a meeting with **VIRA**. During that meeting, Bank President A informed **VIRA** that the FDIC examiners had discovered the loans that **VIRA** had given to Bank President A from First NBC loan proceeds. Bank President A told **VIRA** that they would have to figure out another way to loan money to Bank President A which would escape detection. Bank President A advised **VIRA** that he should not disclose their relationship on any Bank applications in the future.

8.       On or about February 11, 2013, Bank President A approved a 3% interest rate on **VIRA**'s business checking account that previously had been earning a lower rate.

9.       On or about June 4, 2013, **VIRA** provided a personal financial statement to his loan officer at the Bank to support his loan. On that form, **VIRA** omitted the fact that he had loaned money to Bank President A.

10.      On or about September 2, 2014, Bank President A authorized **VIRA** to receive an annual interest rate of 3% on two IRA Money Market accounts at the Bank.

11.      On or about November 5, 2014, **VIRA** signed a personal financial statement to support his loan with the Bank. In that statement, **VIRA** failed to disclose his outstanding loans to Bank President A. **VIRA** also provided inflated account balances at four other banks, falsely

5

stating that he had a total of $15 million in cash deposits at those institutions. **VIRA** provided this false information at the direction of Bank President A.

12.    On or about June 10, 2016, **VIRA** loaned Bank President A $2,000,000.00 derived from **VIRA**'s account at the Bank. Bank President A agreed to pay **VIRA** an annual interest rate of 8% on the loan.

13.    On or about October 4, 2016, **VIRA** signed a personal financial statement to support his loan with the Bank. In that statement, **VIRA** omitted the fact that he had loaned money to Bank President A. **VIRA** also provided inflated account balances at four other banks, falsely stating that he had at total of $15 million in cash deposits at those institutions. Additionally, **VIRA** falsely inflated his real estate holdings by including properties that he did not own. **VIRA** provided this false information at the direction of Bank President A.

14.    On or about October 11, 2016, **VIRA** loaned Bank President A $750,000.00 derived from **VIRA**'s First NBC checking account. Bank President A agreed to pay **VIRA** an annual interest rate of 8% on the loan.

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF FORFEITURE

1.    The allegations contained in Count 1 are hereby realleged and incorporated by reference for the purpose of alleging forfeiture to the United States.

2.    Upon conviction of the offense alleged in Count 1, the defendant, **ARVIND "MIKE" VIRA,** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, involved in said offense, and any property traceable to such property.

3.     If any of the property described above, as a result of any act or omission of the defendant:

       a.     cannot be located upon the exercise of due diligence;

       b.     has been transferred or sold to, or deposited with, a third party;

       c.     has been placed beyond the jurisdiction of the court;

       d.     has been substantially diminished in value; or

       e.     has been commingled with other property which cannot be divided without difficulty,

the United States shall seek a money judgment and, pursuant to Title 21, United States Code, Section 853(p), forfeiture of any other property of the defendant up to the value of said property.

MICHAEL M. SIMPSON
Attorney for the United States
Acting under authority conferred
by 28 U.S.C. § 515

SHARAN E. LIEBERMAN
MATTHEW R. PAYNE
NICHOLAS D. MOSES
J. RYAN MCLAREN
Assistant United States Attorneys

New Orleans, Louisiana
June 15, 2020

No. _____

# United States District Court

## FOR THE

EASTERN _____ DISTRICT OF _____ LOUISIANA

UNITED STATES OF AMERICA

vs.

ARVIND "MIKE" VIRA

### BILL OF INFORMATION FOR
### CONSPIRACY TO COMMIT BANK FRAUD

Violation(s): 18 U.S.C. § 371
18 U.S.C. § 1344

*Filed* _____, *20 20*

_____, *Clerk.*

*By* _____

_____, *Deputy*

MATTHEW R. PAYNE
Assistant United States Attorney

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

FILED | **Jul 01 2020**

**CAROL L. MICHEL**
**CLERK**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

# FELONY

## BILL OF INFORMATION FOR CONSPIRACY TO COMMIT BANK FRAUD AND NOTICE OF FORFEITURE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL DOCKET NO. 20-60** |
| **v.** | * | **SECTION: H(1)** |
| **GARY R. GIBBS** | * | **VIOLATIONS**:   18 U.S.C. § 1349 |
| | * * * | |

The First Assistant United States Attorney, Michael M. Simpson, as the Attorney for the United States, acting on the authority conferred by Title 28, United States Code, Section 515, (hereinafter, "the Attorney for the United States") charges that:

### COUNT 1
### (Conspiracy to Commit Bank Fraud)

**A.     AT ALL TIMES MATERIAL HEREIN:**

1.     First NBC Bank ("the Bank") was a financial institution, as defined in Title 18, United States Code, Section 20, and a member of the Federal Deposit Insurance Corporation ("FDIC") with federally insured deposit accounts. The Bank was established in or about 2006, with its headquarters in New Orleans, Louisiana, within the Eastern District of Louisiana. At various times, the Bank maintained branch offices in Louisiana, Mississippi, and Florida.

___ **Fee** _____
___ **Process** _____
___ **Dktd** _____
___ **CtRmDep** _____
___ **Doc. No** _____

2.      The Bank was the wholly-owned subsidiary of First NBC Bank Holding Company. Bank President A was a founder of the Bank and acted as its President and Chief Executive Officer from in or around May 2006, until in or around December 2016.

3.      The Bank also had a Board of Directors ("the Board").

4.      In or around May 2013, First NBC Bank Holding Company became a publicly-traded company listed on the NASDAQ.

5.      On or about April 28, 2017, the Bank was closed by the Louisiana Office of Financial Institutions, and the FDIC took control over the Bank.

6.      The defendant, **GARY R. GIBBS ("GIBBS")**, was a real estate developer, consultant, and borrower at the Bank. He owned and operated the following entities: Coastal Phoenix Investments, LLC; DeltaCB, LLC; Delta Greenscape, LLC; GRGCB, LLC; GRGCBHS, LLC; CBBB, LLC; and numerous others. **GIBBS** presented himself as having experience in tax credits. While a customer of the Bank, **GIBBS** worked on projects in Arkansas, Louisiana, and Tennessee.

7.      **GIBBS** was a customer at the Bank, both individually and through his entities. Each loan that the Bank made to **GIBBS** was guaranteed by **GIBBS**, his entities, or both. Bank Officer C was **GIBBS's** loan officer, and Bank President A participated in **GIBBS's** relationship with the Bank.

8.      In connection with his Bank loan applications, **GIBBS** had an obligation to provide accurate financial statements prior to any loans, advances, renewals, or increases in loans extended to him and any of his entities.

2

9.     When **GIBBS** submitted personal financial statements or financial information about certain of his entities to the Bank, he and others, including Bank President A, Bank Officer B, and Bank Officer C, caused these supporting documents to be placed into the Bank's records.

10.     By the time the Bank closed, **GIBBS** and his entities owed the Bank over $123 million, not including loans made to nominee borrowers on **GIBBS's** behalf.

**B.     THE CONSPIRACY:**

Beginning at a time unknown to the Attorney for the United States, but at least in or around 2010, through in and around April 2017, in the Eastern District of Louisiana and elsewhere, the defendant, **GARY R. GIBBS**, and others known and unknown to the Attorney for the United States, did knowingly and willfully combine, conspire, confederate, and agree to knowingly and with the intent to defraud, execute and attempt to execute a scheme and artifice to defraud First NBC Bank, a financial institution, and to obtain any of the moneys, funds, credits, and assets, owned by and under the custody or control of First NBC Bank, by means of false and fraudulent pretenses, representations, and promises relating to a material fact, in violation of Title 18, United States Code, Section 1344.

**C.     THE SCHEME AND ARTIFICE TO DEFRAUD:**

1.     It was part of the scheme and artifice to defraud that the defendant, **GARY R. GIBBS**, along with Bank President A, Bank Officer B, and Bank Officer C, unjustly enriched themselves by disguising the true financial status of **GIBBS**, his entities, and other borrowers; concealing the true performance of loans; and misrepresenting the nature of payments to **GIBBS** and his entities.

2.     It was further part of the scheme and artifice to defraud that **GIBBS**, Bank President A, Bank Officer B, and Bank Officer C made false statements and material omissions about

3

**GIBBS**, his entities, and nominee loans used to hide **GIBBS's** true levels of debt. These false statements and material omissions hid the truth about (a) the purpose of the loans, (b) the borrowers' and guarantors' assets and liabilities, (c) the borrowers' and guarantors' cash flow, (d) the collateral underlying the loans, and (e) the expected source of repayment.

3.      It was further part of the scheme and artifice to defraud that **GIBBS**, Bank President A, Bank Officer B, and Bank Officer C used proceeds from loans issued to Borrower E to make loan payments for **GIBBS** and his entities. Borrower E was a borrower at the Bank, but Borrower E was not listed as a guarantor on **GIBBS's** loans.

4.      It was further part of the scheme and artifice to defraud that **GIBBS**, Bank President A, Bank Officer B, and Bank Officer C used proceeds from loans issued to **GIBBS** and his entities to make loan payments for Borrower F. Borrower F was a borrower at the Bank, but **GIBBS** was not listed as a guarantor on Borrower F's loans.

**Insufficient Cash Flow and Loan Masking**

5.      Bank President A, Bank Officer B, and Bank Officer C disguised **GIBBS's** and his entities' true financial condition by, among other things, issuing new loans to make payments on **GIBBS's** existing loans and to cover his overdrafts. The new loans then appeared to be current, while the past-due amounts and overdrafts appeared to have been paid or substantially reduced. This practice ensured that loans to **GIBBS** and his entities did not appear on month-end lists of past-due or overdrawn loans, or if they did appear, the amounts that were past due or overdrawn were substantially lower than they would have been without the new loans. In reality, the new loans were designed to hide **GIBBS's** inability to pay his existing loans without additional loan proceeds from the Bank. To cover up this deceit, Bank President A, Bank Officer B, and Bank Officer C falsely represented that **GIBBS** satisfactorily handled his loan payments and that **GIBBS**

could repay his loans with money he generated from his businesses, in dozens of loan documents over several years.

6.      In or around May 2011, Bank President A, Bank Officer B, and Bank Officer C knew that **GIBBS** overdrew his accounts by hundreds of thousands of dollars and lacked sufficient revenue from his entities to pay his overdrafts and loan payments to the Bank. Nevertheless, Bank President A, Bank Officer B, and Bank Officer C signed loan documents authorizing a new loan of approximately $250,000 to **GIBBS**. Bank President A, Bank Officer B, and Bank Officer C falsely stated that **GIBBS** would pay the new loans with revenue from **GIBBS's** entities. Bank President A, Bank Officer B, and Bank Officer C omitted the material fact that the loans were made to pay **GIBBS's** existing loans and overdrafts and that **GIBBS** did not have enough revenue from his entities to make his loan payments. After the $250,000 loan was made to **GIBBS**, the loan proceeds were used to pay **GIBBS's** overdrafts and to make loan payments. Bank Officer B provided an asset quality report to the Board that falsely omitted **GIBBS** and most of his entities from the lists of overdrawn and past-due loans. Instead, only two of **GIBBS's** entities were listed for overdrafts of less than $5,000, rather than the hundreds of thousands of dollars that **GIBBS** and his entities would have been overdrawn without the new loan.

7.      In or around 2012, a similar pattern continued. Bank President A and Bank Officer C knew that **GIBBS** was still not generating enough revenue from his entities to pay his overdrafts or make his loan payments to the Bank. Nevertheless, Bank President A and Bank Officer C signed loan documents that contained false statements about **GIBBS's** ability to pay his loans with business revenue and omitted the material fact that the loans were made to keep **GIBBS** and his entities off of month-end reports about borrowers who were overdrawn or past due. For example, in or around May 2012, when overdrafts for **GIBBS** and his entities exceeded $1 million,

Bank President A, Bank Officer B, and Bank Officer C arranged a $1 million loan to **GIBBS**. In loan documents, Bank President A, Bank Officer B, and Bank Officer C omitted the material fact that the loan was intended to keep **GIBBS** off of month-end overdraft reports. Similarly, in or around December 2012, Bank President A, Bank Officer B, and Bank Officer C, despite knowing that **GIBBS** continued to be unable to pay his loans to the Bank with revenue from his entities, signed documents approving a loan of approximately $150,000 to **GIBBS**. The loan documents falsely stated that the source of repayment would be cash flow from **GIBBS's** entities. Bank President A, Bank Officer B, and Bank Officer C omitted the material fact that the loan was intended to pay **GIBBS's** overdrafts and past-due loans. As a result of that loan, **GIBBS** and his entities escaped being listed on the overdraft reports or list of past-due loans that Bank Officer B provided to the Board for December 2012.

8.     In or around June and July of 2013, a similar pattern continued. Knowing that **GIBBS** was still not generating enough revenue from his entities to pay his overdrafts or make his loan payments to the Bank, Bank President A and Bank Officer C required the Bank to lend **GIBBS** approximately $1 million per month to pay his existing loans and overdrafts. For this purpose, Bank President A, Bank Officer B, and Bank Officer C signed documents approving a $1 million loan in June 2013 and another $1 million in July 2013 for **GIBBS**. Documents for both loans contained false statements about **GIBBS's** ability to pay his loans with business revenue and omitted the material fact that the loans were made to keep **GIBBS** and his entities off of month-end reports about borrowers who were overdrawn or past due.

**Threats of Bankruptcy**

9.     On more than one occasion, **GIBBS** informed Bank President A and Bank Officer C that **GIBBS** and his entities were unable to make payments on their loans from the Bank, and

that **GIBBS** was considering filing bankruptcy or not paying his loans. Bank President A told **GIBBS** that the Bank could not afford for **GIBBS** to default on the loans. Bank President A and Bank Officer C continued to issue loans to **GIBBS** and his entities. Bank President A and Bank Officer C continued to make false statements and material omissions to hide from the Board, auditors, and examiners that the purpose of the loans was to keep **GIBBS** and his entities from defaulting and that, in reality, neither **GIBBS** nor his entities were able to make their payments to the Bank without receiving proceeds from new loans. Neither Bank President A nor Bank Officer C ever disclosed to the Board, auditors, or examiners that **GIBBS** was considering defaulting on his loans or filing bankruptcy, or that Bank President A told **GIBBS** that the Bank could not afford for **GIBBS** to default.

10.    In or around January 2016, Bank Officer C signed a form for the Bank's auditors regarding the loans to **GIBBS** and his entities. In that form, Bank Officer C falsely stated that, among other things, those loans had not been restructured or modified in response to possible collection problems; that there had not been and was not pending an event of default; that the borrower did not have a history of operating losses, marginal working capital, or inadequate cash flow; and that interest was not currently being added to principal rather than paid. Those statements to the Bank's auditors were false and omitted the material information that **GIBBS** was unable to make loan payments or pay overdrafts without new loans from the Bank. Bank Officer C also omitted the material information that because of **GIBBS's** long history of insufficient cash flow, he would have defaulted on his loans from the Bank if the new loans had not allowed him to convert his past-due interest payments into principal on new loans.

**Falsified Financial Statements**

11.     **GIBBS**, Bank President A, Bank Officer B, and Bank Officer C provided the Bank with materially false and fraudulent documents and personal financial statements, which, among other things, overstated the value of **GIBBS's** and his entities' assets, understated their liabilities, and falsified or omitted other material information.

12.     In or around 2015, **GIBBS** provided Bank President A documents purporting to show that **GIBBS** had a net worth in excess of $50 million as of December 31, 2014. **GIBBS** falsely inflated the value of several of his assets, including residences, commercial real estate, and other investments. Bank President A and Bank Officer C included those documents in credit memoranda supporting loans in 2015. However, **GIBBS** also submitted different financial statements to two other banks, signed and dated on the same date as the financial statements submitted to the Bank. For one of these other banks, **GIBBS** submitted a financial statement that included net worth amounts that were over $19 million less than the amount submitted to the Bank. For the other bank, **GIBBS** submitted a financial statement with a net worth that was over $35 million less.

13.     In or around 2016, Bank President A directed **GIBBS** to revise financial statements for certain of his entities for 2015, reflecting tax credit income. Following Bank President A's instructions, **GIBBS** and his employees gave Bank President A revised financial statements for 2015 that falsely increased the income of several of **GIBBS's** entities, including by increasing the income associated with various tax projects, even though the entities in question had not actually earned that income. The net result of the revisions that Bank President A ordered was to change several of **GIBBS's** entities from having negative income to having positive income, in some cases by a difference of over $1 million, and Bank President A, Bank Officer B, and Bank Officer C

then presented those same false financial statements to the Board. Bank Officer C also provided the falsified financial statements to the Bank's external auditors.

### False Statements about Loan Purposes

14.    In several instances, beginning in or around 2009 and continuing through in or around 2016, President A, Bank Officer B, and Bank Officer C authorized loans to **GIBBS** for specific commercial purposes, but Bank President A, Bank Officer B, Bank Officer C, and **GIBBS** fraudulently diverted the proceeds of those loans to other unrelated purposes, including personal expenses.

### Nominee Lending

15.    Beginning in or around 2011, Bank President A, Bank Officer B, Bank Officer C, and **GIBBS** concealed the true purpose of certain nominee loans. Specifically, they falsely stated in loan documents that a given loan was for one borrower's business purposes, when the true purpose of the loan was to pay another borrower's loans and overdrafts. The nominees included Borrower E, Borrower F, and their related entities.

16.    Bank President A, Bank Officer B, and Bank Officer C submitted loan documents falsely stating that Borrower E was repaying a debt to **GIBBS**. In fact, no such debt to **GIBBS** actually existed, and **GIBBS** was instead obtaining Bank funds by using Borrower E as a nominee. The loan proceeds were transferred directly to **GIBBS** or to his entities, and were, in part, used to pay **GIBBS's** and his entities' existing debts at the Bank or to enrich **GIBBS**.

17.    Bank President A, Bank Officer B, and Bank Officer C, and **GIBBS** regularly made payments on the Borrower F's loans to keep Borrower F current. They used funds from new loans that the Bank made to **GIBBS** and his entities. However, many of Borrower F's loans that **GIBBS** paid were not included in **GIBBS's** financial documents as liabilities.

18.     This practice had the effect of falsely understating **GIBBS's** debt obligations in loans to **GIBBS** and his entities, making them falsely appear to have additional income available to pay new loans. It also kept the loans to the nominees from being downgraded or impaired, even though the nominees were often unable to pay their loans without obtaining new loan proceeds through **GIBBS**.

19.     All in violation of Title 18, United States Code, Section 1349.

## NOTICE OF FORFEITURE

1.     The allegations contained in Count 1 of this Bill of Information are hereby realleged and incorporated by reference for the purpose of alleging forfeiture to the United States.

2.     Upon conviction of the offense alleged in Count 1, the defendant, **GARY R. GIBBS**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, involved in said offense, and any property traceable to such property.

3.     If any of the property described above, as a result of any act or omission of the defendant:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be divided without difficulty,

the United States shall seek a money judgment and, pursuant to Title 21, United States Code, Section 853(p), forfeiture of any other property of the defendant up to the value of said property.

MICHAEL M. SIMPSON
Attorney for the United States
Acting under authority conferred
by 28 U.S.C. § 515


SHARAN E. LIEBERMAN
NICHOLAS D. MOSES
MATTHEW R. PAYNE
J. RYAN MCLAREN
Assistant United States Attorneys

New Orleans, Louisiana
July 1, 2020

No. _____

# 𝕱nited 𝕾tates 𝕯istrict 𝕮ourt

FOR THE

_____ EASTERN _____ DISTRICT OF _____ LOUISIANA _____

UNITED STATES OF AMERICA

*vs.*

GARY R. GIBBS

BILL OF INFORMATION FOR
CONSPIRACY TO COMMIT BANK FRAUD

Violation(s):   18 U.S.C. § 1349

*Filed* _____, 20 _20____

_____, *Clerk.*

*By* _____, *Deputy*

SHARAN LIEBERMAN
Assistant United States Attorney

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 20-60** |
| **v.** | * | **SECTION: H(1)** |
| **GARY R. GIBBS** | * | **VIOLATION: 18 U.S.C. § 1349** |
| | * * * | |

NOTICE OF _____

**TAKE NOTICE** that this criminal case has been set for _____ on _____, 2020 at _____ am/pm, before Judge _____, Room _____, 500 Poydras St, New Orleans, LA, 70130.

**PERSONS ON BOND MUST REPORT TO THE DEPUTY U.S. MARSHAL IMMEDIATELY OUTSIDE THE AFORESAID COURTROOM FOR EVALUATION AND SEARCH 15 MINUTES PRIOR TO APPEARANCE.**

DATE:   6/30/2020

TO:
**GARY R. GIBBS** (Summons)

**Attorneys for Vira**
Timothy Yazbeck
Randall Smith
Smith & Fawer, LLC
201 St. Charles Avenue, Suite 3702
New Orleans, Louisiana 70170
Telephone: (504) 525-2200
tyazbeck@smithfawer.com
rasmith@smithfawer.com

CAROL L. MICHEL, CLERK

By: _____
     Deputy Clerk

U.S. Attorney
Sharan E. Lieberman, T.A.

U.S. Marshal
New Orleans, Louisiana 70130

U.S. Probation Officer
New Orleans, Louisiana 70130

U.S. Pretrial Services Officer
New Orleans, Louisiana 70130

**JUDGE            MAGISTRATE JUDGE**
**COURT REPORTER COORDINATOR**
**INTERPRETER: YES: ( ) NO**

SA Krista Bradford, FBI
kcbradford@fbi.gov

If you change address, notify Clerk of Court
by phone, (504) 589-7600

PER 18 U.S.C. 3170

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☑ INFORMATION ☐ INDICTMENT

| CASE NO. | 20-60 H(1) |

Matter Sealed: ☐ Juvenile ☐ Other than Juvenile

☐ Pre-Indictment Plea ☐ Superseding ☐ Defendant Added
☐ Indictment ☐ Charges/Counts Added
☐ Information

USA vs.

Defendant: GARY R. GIBBS

Address: Niceville, FL 32578

**Name of District Court, and/or Judge/Magistrate Location (City)**

UNITED STATES DISTRICT COURT **EASTERN**
DISTRICT OF LOUISIANA
Divisional Office

Name and Office of Person Furnishing Information on THIS FORM
Danielle M.
☒ U.S. Atty ☐ Other U.S. Agency
Phone No. (504) 680-3000

Name of Asst. U.S. Attorney (if assigned)
Sharan Lieberman

☐ Interpreter Required Dialect: _____

Birth Date 1953
☑ Male
☐ Female
☐ Alien (if applicable)

Social Security Number xxx-xx-8370

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)
SA Krista Bradford, FBI

☐ person is awaiting trial in another Federal or State Court (give name of court)
_____

☐ this person/proceeding transferred from another district per (circle one) FRCrP 20, 21 or 40. Show District
_____

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. Atty ☐ Defense

☐ this prosecution relates to a pending case involving this same defendant. (Notice of Related Case must still be filed with the Clerk.)

SHOW DOCKET NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate Judge regarding this defendant were recorded under

MAG. JUDGE CASE NO.

Place of offense New Orleans, LA County Orleans

### DEFENDANT

Issue: ☐ Warrant ☑ Summons

Location Status:

Arrest Date _____ or Date Transferred to Federal Custody _____

☐ Currently in Federal Custody
☐ Currently in State Custody
☐ Writ Required
☐ Currently on bond
☐ Fugitive

Defense Counsel (if any): Randall Smith and Timothy Yazbeck

☐ FPD ☐ CJA ☑ RET'D
☐ Appointed on Target Letter

☐ This report amends AO 257 previously submitted

## OFFENSE CHARGED - U.S.C. CITATION - STATUTORY MAXIMUM PENALTIES - ADDITIONAL INFORMATION OR COMMENTS

Total # of Counts ___1___ (for this defendant only)

| Offense Level (1, 3, 4) | Title & Section/ (Petty = 1 / Misdemeanor = 3 / Felony = 4) | Description of Offense Charged | Count(s) |
|---|---|---|---|
| 4 | 18 U.S.C. § 1349 | Conspiracy to commit bank fraud | 1 |
| | | | |
| | | | |
| | | | |
| | | | |

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

FILED     **Jul 01 2020**

**CAROL L. MICHEL**
**CLERK**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.** 20-60 |
| **v.** | * | **SECTION:** H(1) |
| **GARY R. GIBBS** | * | |

\* \* \*

### MOTION FOR ISSUANCE OF A SUMMONS

**NOW INTO COURT** comes the United States of America, appearing herein through the undersigned Assistant United States Attorney, who respectfully submits:

The defendant has been charged with violating Title 18, United States Code, Sections 371 and 1349, by a Bill of Information for Conspiracy to Commit Bank Fraud.

___Fee _____
___Process_____
___Dktd_____
___CtRmDep _____
___Doc. No _____

**WHEREFORE**, the United States of America prays that a summons be issued to defendant requiring that defendant appear for initial appearance and arraignment.

Respectfully submitted,

MICHAEL M. SIMPSON
Attorney for the United States
Acting under authority conferred
by 28 U.S.C. § 515

SHARAN E. LIEBERMAN
Assistant United States Attorney
U.S. Attorney's Office (E.D. La.)
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3129
Email: sharan.lieberman@usdoj.gov

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.** 20-60 |
| **v.** | * | **SECTION:** H(1) |
| **GARY R. GIBBS** | * | |

\* \* \*

## O R D E R

Considering the foregoing,

**IT IS HEREBY ORDERED** that a summons be issued directing that defendant appear on

the _____ day of _____, 2020, at _____, before the Honorable _____

in the Eastern District of Louisiana, at 500 Poydras Street, Hale Boggs Federal Building, Room

B407, New Orleans, Louisiana, for initial appearance and arraignment.

New Orleans, Louisiana, this _____ day of _____, 2020.


_____
HONORABLE DANA M. DOUGLAS
UNITED STATES MAGISTRATE JUDGE

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED | **Jul 08 2020**

CAROL L. MICHEL
CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

# FELONY

## BILL OF INFORMATION FOR CONSPIRACY
## TO COMMIT BANK FRAUD AND NOTICE OF FORFEITURE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 20-62** |
| **v.** | * | **SECTION: R(3)** |
| **WARREN G. TREME** | * | **VIOLATION: 18 U.S.C. § 1349** |
| | * * * | |

The Attorney for the United States charges that:

### COUNT 1
(Conspiracy to Commit Bank Fraud)

**A.** **AT ALL MATERIAL TIMES HEREIN:**

1.      First NBC Bank (the "Bank") was a financial institution, as defined in Title 18, United States Code, Section 20(1), and a member of the Federal Deposit Insurance Corporation ("FDIC") with deposits insured by the FDIC. The FDIC is an independent agency created by Congress to maintain the stability and public confidence in the nation's financial system by, among other things, insuring deposits and examining and supervising financial institutions for safety and soundness and consumer protection.

___ **Fee** _____
___ **Process** _____
___ **Dktd** _____
___ **CtRmDep** _____
___ **Doc. No** _____

2. The Bank was established in or around 2006, with its headquarters in New Orleans, Louisiana, within the Eastern District of Louisiana. At various times, the Bank maintained branch offices in Louisiana, Mississippi, and Florida.

3. The Bank was the wholly-owned subsidiary of First NBC Bank Holding Company. Bank President "A" was a founder of the Bank and acted as its President and Chief Executive Officer from in or around May 2006 until in or around December 2016, when he stepped down as CEO and Chairman of the Board.

4. The Bank also had a Board of Directors ("the Board").

5. In or around May 2013, First NBC Bank Holding Company became a publicly-traded company listed on the NASDAQ.

6. From its inception until approximately April 2017, the Bank's assets grew to approximately $5 billion. The Bank funded this rapid growth, in part, by increasing its loan portfolio.

7. On or about April 28, 2017, the Bank was declared failed and was closed by the Louisiana Office of Financial Institutions. Thereafter, the FDIC took control over the Bank. The Bank's failure cost the FDIC's deposit insurance fund approximately $996.9 million.

8. **WARREN G. TREME ("TREME")** was a businessman and part owner of the following entities: BNW Ventures, Airline Investment Properties, Airline Investments II, Gulf Mississippi River Port, and Treme Builders. Together with Bank President A, **TREME** also owned Wadsworth Estates, R Bend Estates Homes, R Bend Estates, and R Bend Estates II. **TREME** and certain of his entities were borrowers at the Bank. By the time the Bank closed, **TREME** and his entities owed the Bank approximately $6.3 million.

**B.**     **CONSPIRACY TO COMMIT BANK FRAUD:**

Beginning at a time unknown, but from at least 2006, through in and around April 2017, in the Eastern District of Louisiana and elsewhere, the defendant, **WARREN G. TREME**, Bank President A, Bank Officer B, and others known and unknown to the Attorney for the United States, did knowingly and willfully combine, conspire, confederate, and agree to knowingly and with the intent to defraud, execute and attempt to execute a scheme and artifice to defraud First NBC Bank, a financial institution, and to obtain any of the moneys, funds, credits, and assets, owned by and under the custody or control of First NBC Bank by means of false and fraudulent pretenses, representations, and promises relating to a material fact, in violation of Title 18, United States Code, Section 1344.

**C.**     **THE SCHEME AND ARTIFICE TO DEFRAUD:**

1.      It was part of the scheme and artifice to defraud that the defendant, **WARREN G. TREME**, Bank President A, and Bank Officer B unjustly enriched themselves by disguising the true financial status of **TREME** and his entities' loans, which in turn concealed the true financial condition of **TREME** and his entities from the Board, auditors, and examiners.

2.      It was further part of the scheme and artifice to defraud that **TREME**, Bank President A, and Bank Officer B concealed the true financial condition of **TREME** and his entities' loans in many ways, including (1) overdrawing demand deposit accounts to make loan payments; (2) using Bank loan proceeds to make loan payments; (3) and increasing, extending, or renewing existing loans, and issuing new loans, to hide **TREME's** inability to make loan payments. These actions benefitted **TREME** by, among other things, preventing **TREME** from being forced into default and the Bank from declaring a loss.

3.      It was further a part of the scheme and artifice to defraud that **TREME**, Bank President A, and Bank Officer B knowingly and intentionally diverted loan proceeds from **TREME's** loans to benefit Wadsworth Estates, a real estate development project jointly owned by **TREME** and Bank President A.

4.      It was further part of the scheme and artifice to defraud that **TREME**, Bank President A, and Bank Officer B, knowingly and intentionally concealed Bank President A's participation in and oversight of **TREME's** loans, which benefited Bank President A, from the Board, auditors, and examiners.

### The TREME Banking Relationship

5.      Prior to the founding of the Bank, **TREME** was a borrower at Bank B, where Bank President A was President before he left to help found First NBC Bank. Bank President A and **TREME** were partners in several business ventures, including Wadsworth Estates. Despite this conflict of interest, Bank President A exercised authority over **TREME's** loans at Bank B.

6.      From at least 2008 through in or around April 2017, **TREME** was a borrower at First NBC Bank. Because of Bank President A and **TREME's** business relationship, another Bank employee served as the loan officer for **TREME's** loans, while Bank Officer B served as the approving officer and assigned the credit risk rating to those loans. Although Bank President A should not have been involved in **TREME's** borrowing relationship, he continued to exercise authority over **TREME's** loans by, among other things, approving overdraft payments and loan disbursements.

7.      In numerous loan documents over several years, **TREME** made misrepresentations and material omissions related to his financial status and the purpose of his loans. Bank President A and Bank Officer B were aware of these misrepresentations and material omissions. Rather than

4

writing off **TREME's** loans or otherwise discouraging **TREME** from lying in loan documents, Bank President A and Bank Officer B approved and facilitated **TREME's** loans, knowing they contained these misrepresentations and material omissions. They also made misrepresentations and material omissions of their own regarding **TREME's** loans.

8.     For example, in June 2014, **TREME** signed loan documents stating that he intended to use loan proceeds on working capital for long term investments. In reality, these loan proceeds were used to pay previous **TREME** loans and an overdraft in **TREME's** deposit account, as well as some of his personal expenses, including restaurants, bars, and golf fees. **TREME** lacked sufficient income and cash flow from his businesses to pay his own loans and personal expenses. As a result, **TREME** relied on the Bank loans to fund his debt service and lifestyle. Bank President A and Bank Officer B were aware of **TREME's** true financial status. Nevertheless, Bank President A and Bank Officer B approved and facilitated the June 2014 loan by, among other things, falsely stating that the loan contained normal risks, falsely stating that **TREME** would repay the loan using income from his businesses, and falsely omitting the material fact that **TREME** lacked sufficient income to make his own loan payments unless he received additional loans.

9.     In February 2016, **TREME** signed loan documents stating that he intended to use loan proceeds to cover business expenses. Rather than using the proceeds for their stated purpose, **TREME** spent the money on renovations to his personal residence, gambling, and $74,000 in payments related to Wadsworth Estates, the business **TREME** co-owned with Bank President A. Bank President A and Bank Officer B approved and facilitated the February 2016 loan by, among other things, stating that **TREME** would repay the loan with income from his businesses and

falsely omitting the material fact that **TREME** lacked sufficient income to make his own loan payments unless he received additional loans.

10.    In these and other loans, **TREME** worked with Bank President A and Bank Officer B to funnel money to himself and to his entities, including Wadsworth Estates, the business **TREME** co-owned with Bank President A. To accomplish this, Bank President A and Bank Officer B lied to and concealed material information related to **TREME's** loans from the Board, auditors, and examiners.

11.    Additionally, in late 2015 and early 2016, **TREME**, Bank President A, and Bank Officer B negotiated a settlement with two of **TREME's** other business partners. As part of the settlement, **TREME's** business partners agreed to pay the Bank $400,000. Rather than using the $400,000 to pay down the outstanding loan debt owed by **TREME** and his business partners, Bank President A and Bank Officer B gave $300,000 to **TREME**. **TREME** spent the money on gambling, a trip to the Caribbean, and approximately $14,000 in expenses related to Wadsworth Estates. During a subsequent Board meeting, Bank President A and Bank Officer B falsely stated that the $300,000 was used to pay down the outstanding loan debt owed by **TREME** and his business partners.

All in violation of Title 18, United States Code, Sections 1349.

### **NOTICE OF FORFEITURE**

1.    The allegations contained in Count 1 of this Bill of Information are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(2)(A).

2.    Upon conviction of the offense in violation of Title 18, United States Code, Sections 1349 set forth in Count 1 of this Bill of Information, the defendant, **WARREN G.**

**TREME**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violation.

        3.     If any of the property described above, as a result of any act or omission of the defendant:

        a.     cannot be located upon the exercise of due diligence;

        b.     has been transferred or sold to, or deposited with, a third party;

        c.     has been placed beyond the jurisdiction of the court;

        d.     has been substantially diminished in value; or

        e.     has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

        All pursuant to 18 U.S.C. § 982(a)(2)(A).

MICHAEL M. SIMPSON
Attorney for the United States
Acting under authority conferred
by 28 U.S.C. § 515

SHARAN E. LIEBERMAN
J. RYAN McLAREN
MATTHEW R. PAYNE
NICHOLAS D. MOSES
Assistant United States Attorneys

New Orleans, Louisiana
July 8, 2020

No. _____

# United States District Court

## FOR THE

EASTERN _____ DISTRICT OF _____ LOUISIANA

UNITED STATES OF AMERICA

*vs.*

WARREN G. TREME

BILL OF INFORMATION FOR
CONSPIRACY TO COMMIT BANK FRAUD

Violation(s):  18 U.S.C. § 1349

Filed _____, 20 20

_____, Clerk.

By _____, Deputy

SHARAN LIEBERMAN
Assistant United States Attorney

FILED
U.S. DIST. COURT
EASTERN DISTRICT OF LA.

2020 JUL 10 P 5: 45

CAROL L. MICHEL
CLERK

# FELONY

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

### INDICTMENT FOR CONSPIRACY TO COMMIT BANK FRAUD,
### BANK FRAUD, FALSE ENTRIES, AND NOTICE OF FORFEITURE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | CRIMINAL NO. 20 - C0065 |
| **v.** | * | SECTION: SECT.HMAG.4 |
| **ASHTON J. RYAN, JR.** | * | VIOLATIONS: 18 U.S.C. § 1344 |
| **WILLIAM J. BURNELL** | | 18 U.S.C. § 1349 |
| **ROBERT B. CALLOWAY** | * | 18 U.S.C. § 1005 |
| **FRANK J. ADOLPH** | | 18 U.S.C. § 2 |
| | * | |

\* \* \*

The Grand Jury charges that:

### COUNT 1
(Conspiracy to Commit Bank Fraud)

**A.** **AT ALL MATERIAL TIMES HEREIN:**

1.     First NBC Bank (the "Bank") was a financial institution, as defined in Title 18, United States Code, Section 20(1), and a member of the Federal Deposit Insurance Corporation ("FDIC") with deposits insured by the FDIC. The FDIC is an independent agency created by Congress to maintain the stability and public confidence in the nation's financial system by, among

_ Fee _____
_ Process _____
X Dktd _____
_ CtRmDep _____
_ Doc. No. _____

other things, insuring deposits and examining and supervising financial institutions for safety and soundness and consumer protection.

2.      The Bank was established in or around 2006, with its headquarters in New Orleans, Louisiana, within the Eastern District of Louisiana. At various times, the Bank maintained branch offices in Louisiana, Mississippi, and Florida. The Bank was the wholly-owned subsidiary of First NBC Bank Holding Company. In or around May 2013, First NBC Bank Holding Company became a publicly-traded company listed on the NASDAQ.

3.      The Bank also had a Board of Directors ("the Board").

4.      From its inception until approximately April 2017, the Bank's assets grew to approximately $5 billion. The Bank funded this rapid growth, in part, by increasing its loan portfolio.

5.      On or about April 28, 2017, the Bank was closed by the Louisiana Office of Financial Institutions, and the FDIC took control over the Bank. The Bank's failure cost the FDIC's deposit insurance fund approximately $996.9 million.

### Members of the Conspiracy

6.      **ASHTON J. RYAN, JR. ("RYAN")** was a founder of the Bank and acted as its President, Chief Executive Officer, and Chairman of the Board from in or around May 2006 until in or around December 2016 when he stepped down as CEO and Chairman of the Board. **RYAN** was responsible for developing and executing the Bank's strategic plan, overseeing all of the Bank's affairs, and managing the Bank's day-to-day operations. Additionally, **RYAN** was responsible for keeping other Board members informed of the Bank's financial condition, the adequacy of its policies and procedures, and internal controls. From 2006 through December 2016, **RYAN** received over $10 million in compensation and other payments from the Bank. **RYAN** also

2

received employment benefits, including membership at three country clubs in the New Orleans area.

7. From in or around 2006 through April 2017, **WILLIAM J. BURNELL** (**"BURNELL"**) was the Bank's Chief Credit Officer. He was responsible for, among other things, the overall quality of the Bank's lending function; the Bank's credit policies and administration; the Bank's loan recovery and collection efforts; and the Bank's monitoring and managing of past-due loans, including the approval of the Bank's internal list of past-due loans. **BURNELL** was responsible for compiling month-end reports, including lists of overdrawn borrowers and past-due loans. These reports should have accurately shown the quality of the Bank's assets, which included loans. Misrepresentations on these reports would have distorted a true assessment of the Bank's overall financial well-being. **BURNELL** was also responsible for assigning risk ratings before the Bank lent to its customers. In the Bank's rating system, a "10" meant very low risk of loss to the Bank, while a "1" signified a high risk of loss to the Bank. From 2009 through April 2017, **BURNELL** received compensation from the Bank of over $3.5 million.

8. From in or around 2006 through April 2017, **ROBERT B. CALLOWAY** (**"CALLOWAY"**) was employed by the Bank as an Executive Vice President and served as a commercial relationship manager with tax credit specialization. From 2009 through April 2017, **CALLOWAY** received compensation of more than $2.3 million.

9. Gary Gibbs ("Gibbs") was a real estate developer and borrower at the Bank. He owned and operated the entities Coastal Phoenix Investments, CBBB, Delta Greenscape, DeltaCB, GRGCB, GRGCBHS, HP South, and numerous others. **CALLOWAY** was Gibbs's loan officer. **RYAN, BURNELL,** and **CALLOWAY** exercised authority over Gibbs's loans. By the time the Bank closed, Gibbs and his related entities owed approximately $123 million to the Bank.

3

10.     Kenneth Charity ("Charity") was a real estate investor and borrower at the Bank. Charity had a banking relationship with the Bank individually and through the entities DMK Group Three, DMK Group Five, DMK Acquisitions and Properties, DMK Enterprises, 190W1515, and 21W104. From in or around February 2007 through in or around September 2016, **RYAN** was Charity's loan officer, and **BURNELL** participated with **RYAN** in decisions affecting the Charity loans. By the time the Bank closed, Charity and his related entities owed the Bank approximately $18 million.

11.     Gregory St. Angelo ("St. Angelo") was an attorney, and from in or around September 2006 through in or around September 2016, he was the Bank's General Counsel. From in or around 2006 through April 2017, St. Angelo also had a banking relationship with the Bank individually and through various entities, including St. Angelo Investment Company, Premier Information Systems, Conti Development, Annadele, and 616 Girod. From in or around July 2006, through in or around September 2016, **RYAN** was the loan officer for St. Angelo and his entities, and **BURNELL** participated with **RYAN** in decisions affecting the St. Angelo loans. By the time the Bank closed, St. Angelo and his entities owed the Bank approximately $46.7 million. **RYAN** and **BURNELL** also caused the Bank to pay St. Angelo approximately $9.6 million for fake tax credit investments.

12.     **FRANK J. ADOLPH ("ADOLPH")** was a businessman and borrower at the Bank individually and through related entities, including Metro Rediscount Company, Motorcycle Acquisition and Investment Company, and Frank Adolph, LLC. **ADOLPH's** loans were secured, in part, by accounts receivable from his factoring business. By the time the Bank closed, **ADOLPH** and his related entities owed the Bank approximately $6.1 million.

4

13.    Arvind Vira ("Vira") was a New Orleans hotel owner. In 2008, Vira moved his accounts to the Bank at **RYAN's** urging, and became a borrower at the Bank. Beginning in 2009, **RYAN** took loans from Vira, knowing that the funds were derived from Bank loan proceeds. **RYAN** and Vira concealed this loan relationship from the Board, auditors, and examiners. Vira, at **RYAN's** direction, inflated his assets on loan documents so that he could receive beneficial interest rates on Bank loans. **RYAN** then ensured that Vira received the most favorable interest rates of any customer at the Bank on his savings and checking accounts. By the time the Bank closed, Vira owed the Bank approximately $39 million, and **RYAN** owed Vira approximately $2.75 million.

14.    Warren Treme ("Treme") was a businessman and part owner of the following entities: BNW Ventures, Airline Investment Properties, Airline Investments II, Gulf Mississippi River Port, and Treme Builders. Together with **RYAN**, Treme also owned Wadsworth Estates, R Bend Estates Homes, R Bend Estates, and R Bend Estates II. Treme and certain of his entities were borrowers at the Bank. By the time the Bank closed, Treme and his entities owed the Bank approximately $6.3 million.

15.    Jeffrey Dunlap ("Dunlap") was a contractor and the owner of Phoenix Civil Contractors ("Phoenix"). In or around March 2009, **RYAN** began using Phoenix as a contractor to develop Wadsworth Estates, a property owned by **RYAN** and Treme. At the same time, **RYAN** was the loan officer for Phoenix and Dunlap while they were borrowers at the Bank. **RYAN** reviewed and approved loans and loan increases for Phoenix and Dunlap, while Dunlap worked for **RYAN** and Treme on the Wadsworth Estates project. Phoenix's loans were secured by a percentage of Phoenix's accounts receivable. From in or around 2009 through in or around 2017, Wadsworth Estates and R Bend Estates II, both of which were owned by **RYAN** and Treme, were

5

listed as accounts on Phoenix's accounts receivable. At the time the Bank closed, Phoenix owed the Bank approximately $22 million.

## B.   CONSPIRACY TO COMMIT BANK FRAUD:

Beginning at a time unknown, but from at least 2006, through in and around April 2017, in the Eastern District of Louisiana and elsewhere, the defendants, **ASHTON J. RYAN, JR., WILLIAM J. BURNELL, ROBERT B. CALLOWAY, FRANK J. ADOLPH**, and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree to knowingly and with the intent to defraud, execute and attempt to execute a scheme and artifice to defraud First NBC Bank, a financial institution, thereby placing First NBC Bank at risk of civil liability or financial loss, by means of false and fraudulent pretenses, representations, and promises, relating to a material fact, in violation of Title 18, United States Code, Section 1344(1).

## C.   THE SCHEME AND ARTIFICE TO DEFRAUD:

1.      It was part of the scheme and artifice to defraud that the defendants, **ASHTON J. RYAN, JR., WILLIAM J. BURNELL, ROBERT B. CALLOWAY, FRANK J. ADOLPH**, and others unjustly enriched themselves by disguising the true financial status of certain borrowers and their troubled loans in order to conceal the true financial condition of the Bank from the Board, auditors, and examiners.

2.      It was further part of the scheme and artifice to defraud that **RYAN, BURNELL, CALLOWAY**, and others masked the true financial condition of troubled loans in many ways, including (1) overdrawing demand deposit accounts to make loan payments; (2) using Bank loan proceeds from nominee and related entities, at times without authorization from the borrower, to make loan payments; and (3) increasing, extending, or renewing existing loans, and issuing new

6

loans, to hide borrowers' inability to make loan payments. These actions benefitted the defendants by, among other things, preventing the borrowers from being forced into default and the Bank from declaring a loss. Gibbs, St. Angelo, Charity, **ADOLPH**, Treme, Dunlap, and other borrowers made few, if any, payments on their Bank loans with funds other than loan proceeds. As a result, the debt of these borrowers grew.

### Gary Gibbs Banking Relationship

3.        From in or around 2008 through in or around April 2017, Gibbs was a real estate developer and borrower at the Bank, both individually and through his numerous entities. **CALLOWAY** was Gibbs's loan officer. **RYAN** served as the approving officer on Gibbs's loans, and **BURNELL** approved the credit risk rating. **RYAN, BURNELL,** and **CALLOWAY** frequently discussed Gibbs's loans with each other and with other Bank employees. **RYAN** and **CALLOWAY** also discussed the loans with Gibbs and Gibbs's employees.

4.        From early in Gibbs's borrowing relationship, **RYAN, BURNELL,** and **CALLOWAY** knew that Gibbs's spending was out of control and that Gibbs's entities did not generate sufficient income to make Gibbs's loan payments. Despite this knowledge, **RYAN, BURNELL,** and **CALLOWAY** funneled loan proceeds to Gibbs by approving and facilitating loans. **CALLOWAY** and others often used loan proceeds to pay Gibbs's overdrafts and existing debt service, which artificially kept Gibbs off of month-end reports. The month-end reports documented borrowers with overdrafts or past-due loans. Other loan proceeds went to Gibbs's personal expenses, including private planes Gibbs used for personal travel, two sport fishing boats, vehicles for Gibbs and his family, as well as several personal residences. As **RYAN, BURNELL,** and **CALLOWAY** knew, Gibbs could not afford to make his loan payments or finance his lifestyle without loan proceeds. In an effort to avoid or minimize Gibbs's appearances on the overdraft and

past-due reports, **RYAN**, **BURNELL**, and **CALLOWAY** made misrepresentations and material omissions regarding Gibbs's creditworthiness and financial status. These misrepresentations and omissions also allowed **RYAN**, **BURNELL**, and **CALLOWAY** to avoid writing off Gibbs's loans and to evade inquiries by the Board, auditors, and examiners.

5.      For example, in dozens of loan documents over several years, **RYAN**, **BURNELL**, and **CALLOWAY** falsely represented that Gibbs satisfactorily handled his loan payments and that Gibbs would repay his loans with money he generated from his businesses. As Gibbs's debt at the Bank grew to over $100 million with no signs of slowing down, **RYAN**, **BURNELL**, and **CALLOWAY** continued to misrepresent the manner in which the proceeds from Gibbs's loans would be spent and the manner in which the loans would be repaid. Often, **RYAN**, **BURNELL**, and **CALLOWAY** falsely represented that Gibbs's loans were for "working capital" or to finance Gibbs's business expenses, when in truth and in fact, **RYAN**, **BURNELL**, and **CALLOWAY** used the loan proceeds to make payments on his previous loans.

6.      **RYAN**, **BURNELL**, and **CALLOWAY** knew, but chose not to disclose in either loan documents or to the Board, auditors, or examiners, that Gibbs's businesses failed to generate sufficient revenues to cover his debts at the Bank and that Gibbs had substantial expenses that he could not have paid without loan proceeds. Despite this knowledge, **RYAN**, **BURNELL**, and **CALLOWAY** signed loan documents that assigned a false and inaccurate credit risk rating of 5 to Gibbs and his entities, when in truth and in fact, they should have been rated 3 or lower.

7.      **RYAN** directed Gibbs to submit false financial statements to the Bank to support Gibbs's loans. In the financial statements, Gibbs fraudulently inflated his assets and deflated his liabilities to appear more creditworthy. **RYAN**, **BURNELL**, and **CALLOWAY** knew that Gibbs's financial statements did not accurately describe Gibbs's financial status and

creditworthiness. Nevertheless, **RYAN**, **BURNELL**, and **CALLOWAY** allowed Gibbs to provide false financial statements to support his loans.

8.     By the end of 2016, **RYAN**, **BURNELL**, and **CALLOWAY's** practice of funneling money to Gibbs led to Gibbs's borrowing relationship becoming one of the largest in the Bank's loan portfolio. Despite the numerous risks associated with Gibbs's loans and the substantial threat Gibbs's borrowing relationship posed to the Bank, **RYAN**, **BURNELL**, and **CALLOWAY** continued to approve and facilitate Gibbs's loans, and they concealed the truth regarding Gibbs's inability to pay his loans from the Board, auditors, and examiners.

#### Kenneth Charity Banking Relationship

9.     Kenneth Charity was the owner of residential properties in the New Orleans area. In or around 2007, he became a borrower at the Bank. **RYAN** was Charity's loan officer.

10.     **RYAN** kept Charity and his related entities off the overdraft and past-due loan lists by directing employees to keep a "cheat sheet." This cheat sheet helped **RYAN** determine the amount of loan proceeds Charity needed to cover loan payments and overdrafts by month-end so **RYAN** could keep Charity off the month-end reports. **RYAN**, **BURNELL**, and others masked the poor quality of Charity's loans, which delayed the Bank from downgrading them.

11.     **RYAN** and **BURNELL** knew that Charity had insufficient cash flow to pay his loans at the Bank. **RYAN** and **BURNELL** were aware that Charity did not spend, and demonstrated no intention of spending, the loan proceeds for the approved purpose. **RYAN** knew the Charity overdrafts included significant use of loan proceeds on personal expenses because **RYAN** monitored the status of Charity's accounts on a monthly basis by taking Charity-related "homework" to his house at night to review.

9

*Lake Terrace Shopping Center*

12.     In or around April 2007, Charity purchased the Lake Terrace Shopping Center in New Orleans using loan proceeds from the Bank.

13.     During the time that Charity owned the shopping center, **RYAN** represented in loan documents and elsewhere that Charity needed additional loan proceeds to develop the property. **RYAN** also represented in loan documents and elsewhere that development of the shopping center was about to begin or that it would soon be completed.

14.     In truth and in fact, the shopping center was never developed, and the City of New Orleans cited it for blight in 2012. Nonetheless, as late as February 2015, **RYAN** falsely represented to auditors that the shopping center was under construction or close to being finished.

15.     **RYAN** also falsely represented to the Board, auditors, and examiners that Charity was entitled to government grant money and low-interest, forgivable loans of approximately $4 million. **RYAN** knew as early as November 2013 that Charity's applications for these funds were denied.

*False Statements about Nominee D*

16.     Nominee D was a friend of Charity's and his business partner on certain real estate projects. Nominee D was also a guarantor on many of Charity's loans.

17.     Nominee D did not have a deposit account at the Bank and did not have signature authority on any accounts associated with Charity.

18.     **RYAN** and **BURNELL** instructed Bank employees to process loans where Nominee D was a guarantor without receiving signatures from Nominee D. Neither **RYAN** nor **BURNELL** disclosed these practices to the Board, auditors, or examiners.

19.    **RYAN** falsely represented in Bank documents, to the Board, and to others that Nominee D had sufficient cash flow to cover Charity's debt. **RYAN** also falsely represented in Bank documents, to the Board, and to others that Nominee D was a willing guarantor and making payments on Charity's debt. In reality, Nominee D did not make payments on Charity's debt. Further, by January 2013, **RYAN** believed that Nominee D had serious reservations about guaranteeing Charity's debt.

*620 Decatur Street*

20.    **RYAN** and **BURNELL** misrepresented and omitted material information in Bank documents and to the Board, auditors, and examiners about a commercial real estate space at 620 Decatur Street in the French Quarter. Charity purchased the space with Bank loan proceeds in July 2008.

21.    On or about January 24, 2011, **RYAN** arranged for another Bank borrower, Borrower J, to rent space from Charity at 620 Decatur Street for approximately $20,000 per month. This arrangement ensured that Charity had a stable source of income. Borrower J operated a beignet shop in the rented space at 620 Decatur Street.

22.    In or around October 2013, Borrower J made his last loan payment to the Bank and stopped paying rent to Charity. **RYAN** and **BURNELL** then arranged for the Bank to take over the beignet shop from Borrower J and make monthly payments to Charity. On or about February 28, 2014, **BURNELL** caused an account to be opened at the Bank, controlled by **RYAN** and **BURNELL**, to operate the beignet shop. Beginning in or around April 2014 and continuing through in or around March 2017, the Bank, as operator of the beignet shop, paid $20,000 in rent every month to Charity. **RYAN** and **BURNELL** used the monthly payments to make Charity

11

appear more creditworthy and regularly cited the payments as a revenue-generating aspect of Charity's business.

23.      **RYAN** and **BURNELL** made misrepresentations about the beignet shop's profitability and value. Further, when the Bank's beignet shop account was overdrawn at the end of 2014, **RYAN** and **BURNELL** arranged for approximately $171,000 to be drawn from Borrower J's dormant line of credit to clear the overdraft. **RYAN** and **BURNELL** refused to write off Borrower J's loans, even after Borrower J was sentenced to prison and ordered to pay his victims approximately $993,000 in restitution. When the Bank failed, the Bank's beignet shop account was overdrawn by more than $200,000.

24.      From on or about August 27, 2014 through on or about December 8, 2016, **RYAN** and **BURNELL** fraudulently issued four loans to Charity for the stated purpose of enclosing the patio area at the beignet shop. In four instances—in or around August 2014, December 2015, March 2016, and August 2016—**RYAN** and **BURNELL** caused Bank funds to be disbursed for the full costs of the same patio enclosure. The four loans totaled approximately $1.5 million. In several loan documents, **RYAN** stated that the enclosure would generate additional revenue for the beignet business and increase the value of the real estate. In truth and in fact, and as **RYAN** and **BURNELL** well knew, the loan proceeds never went to the patio enclosure. Rather, as **RYAN** and **BURNELL** well knew, the money went to make loan payments, pay overdrafts, and pay Charity's personal expenses, including credit card bills, student loans, and jewelry.

### Gregory St. Angelo Banking Relationship

25.      From 2006 through September 2016, St. Angelo was General Counsel of the Bank. He and his entities were borrowers at the Bank from 2006 through April 2017.

12

26.     **RYAN** and **BURNELL** made misrepresentations and omitted material information from the Board, auditors, and examiners about St. Angelo's financial status and creditworthiness.

27.     For example, to avoid detection by the Board, auditors, and examiners, **RYAN** and **BURNELL** directed Bank employees to track monthly payments due on St. Angelo's loans and overdrafts in his accounts. After reviewing these reports, **RYAN** and **BURNELL** issued fraudulent loans to St. Angelo and his entities in order to clear his accounts, which were often overdrawn by hundreds of thousands of dollars, and make payments on other loans. This practice was designed to prevent his exposure to the Board, auditors, and examiners as a loan default risk.

28.     From at least 2009 through 2015, **RYAN** and **BURNELL** caused the Bank to make false and fraudulent investments in fake tax credits for St. Angelo's projects at 622 Conti Street and 616 Girod Street in New Orleans and Annadele's restaurant in Covington. **RYAN** and **BURNELL** used the fraudulent tax credit investment money to pay St. Angelo's loans and cover his overdrafts with the Bank.

29.     **RYAN** and **BURNELL** used St. Angelo's loan proceeds to pay other borrowers' debt or, alternatively, used other borrower's loans to pay St. Angelo's debt. For example, from in or around June 2009 through December 2013, **RYAN** and **BURNELL** caused Nominee A's loans to be disbursed into St. Angelo's accounts to cover overdrafts and make loan payments on St. Angelo's loans. **RYAN** and **BURNELL** did not disclose in the loan documents for Nominee A's loans that they were used for the benefit of St. Angelo. **RYAN** and **BURNELL** did not disclose in Bank documents that St. Angelo was paying other borrower's debts.

### Frank J. Adolph Banking Relationship

30.     From in or around August 2008 through April 2017, **FRANK J. ADOLPH** was a borrower at the Bank. While **RYAN** was not **ADOLPH's** loan officer, **RYAN** signed **ADOLPH's**

13

loan documents as an approving officer, and **BURNELL** approved the credit risk rating.

31.     **ADOLPH** operated Metro Rediscount, a business that bought other companies' accounts receivable. **ADOLPH** submitted a certificate to the Bank listing Metro Rediscount's accounts receivable, and that certificate was included in loan documents to support **ADOLPH's** loans.

32.     **ADOLPH** made misrepresentations and material omissions in documents he submitted to the Bank to obtain loans. For example, in a May 2015 loan package, **ADOLPH** submitted a January 2015 statement from a different bank for an account that was non-existent at the time. The forged bank statement gave the false impression that his company, Metro Rediscount, was receiving payments from companies that were not actually in business with **ADOLPH.**

33.     Additionally, **ADOLPH** fabricated Metro Rediscount's accounts receivable to allow him to borrow more money. For example, in a July 2014 loan document, **ADOLPH** submitted a certificate that falsely listed two companies as owing Metro Rediscount tens of thousands of dollars. **ADOLPH** listed one company that had never done business with Metro Rediscount and another company that had not done business with Metro Rediscount since 2012. In a May 2015 loan package, **ADOLPH** submitted a certificate dated January 31, 2015, that falsely listed the same two companies as owing Metro Rediscount money.

34.     In or around August 2013, **ADOLPH's** loan officer hired an outside auditor to audit **ADOLPH's** accounts receivable. The auditor interviewed **ADOLPH** and asked about the fraudulent accounts receivable on the certificate that **ADOLPH** provided the Bank. Despite being put on notice by the auditor that **ADOLPH's** self-described accounts receivable did not exist, **ADOLPH** continued to use the same false information in subsequent certificates he submitted to the Bank.

14

35.     Between in or around October 2013 and February 2014, **ADOLPH's** loan officer repeatedly alerted **RYAN** and **BURNELL** about **ADOLPH's** fraudulent accounts receivable and warned them that **ADOLPH** was living beyond his means and could not pay his debt to the Bank. Despite their knowledge of **ADOLPH's** fraudulent representations to the Bank, **RYAN** and **BURNELL** chose to approve additional loans for **ADOLPH**, and failed to alert the Board, auditors, or examiners about **ADOLPH's** fraudulent accounts receivable.

36.     Between in or around December 2013 and September 2015, **RYAN** and **BURNELL** recommended, authorized, and approved approximately $5.8 million in new loans, renewals with increases, and consolidated loans to **ADOLPH**, despite being aware of **ADOLPH's** fraud. Although the stated purpose of many of the loans was to finance the working capital needs of Metro Rediscount or to finance Metro Rediscount's accounts receivable, **RYAN** and **BURNELL** knew the loan documents were fraudulent.

37.     **RYAN** and **BURNELL** included **ADOLPH's** false accounts receivable in loan documents despite their knowledge that the accounts receivable were fraudulent and that they gave the false impression that **ADOLPH** could pay his loans.

### Arvind Vira Banking Relationship

38.     Arvind Vira was a hotel owner in the New Orleans area. From in or around June 2008 until 2017, Vira was a borrower at the Bank.

39.     In or around 2010, **RYAN** began borrowing money from Vira. FDIC regulations required **RYAN** to disclose his relationship with Vira to Bank employees because it could improperly result in favorable treatment for a customer. However, **RYAN** instructed Vira not to disclose to Bank employees that he was loaning **RYAN** money.

15

40.     **RYAN** further instructed Vira to inflate his assets on loan documents. Vira complied with **RYAN's** instructions by falsely claiming that he had $15 million on deposit at other banks and by misrepresenting the amount of real estate that he owned.

41.     Vira agreed to lend **RYAN** funds derived from Vira's lines of credit at the Bank. **RYAN** agreed to pay Vira between 6 percent and 8 percent interest on his loans from Vira. The interest rate that Vira received from **RYAN** was substantially higher than the interest rate Vira had to pay to the Bank for his lines of credit. At **RYAN's** instruction, Vira did not disclose his loan relationship with **RYAN** or the interest income that Vira received from **RYAN** to the Bank.

42.     In return for Vira loaning money to **RYAN**, **RYAN** ensured that Vira received beneficial treatment from the Bank. The beneficial treatment included low interest rates on his loans with the Bank and high interest rates on Vira and his family's personal and business savings and checking accounts. The interest rates on these savings and checking accounts were among the highest interest rates given to any Bank customer.

43.     **RYAN** took steps to conceal this relationship from the Board, auditors, and examiners. During an FDIC regulatory exam in December 2012, FDIC examiners discovered that **RYAN** had borrowed money from the Bank using Vira's loan proceeds. When examiners questioned **RYAN**, he admitted to his relationship with Vira, but he falsely claimed that he had not been aware that the source of the funds Vira loaned him were Bank loan proceeds. The examiners warned **RYAN** that it was a conflict of interest, a violation of banking regulations, and a violation of company policy for him to borrow funds from a Bank customer such as Vira without disclosing the lending relationship to the Board. Despite this warning from the examiners, **RYAN** instructed Vira to continue concealing their loan relationship from others at the Bank.

44. By the time the Bank failed in April 2017, the balances on loans issued to Vira totaled over $39 million. Vira and his family members had received approximately $2.3 million in interest on savings and checking accounts from the Bank. **RYAN** had paid Vira approximately $840,000 in interest on the loans he obtained from Vira.

45. As of the date of this indictment, **RYAN** owed Vira approximately $2,750,000, not including accrued interest.

### Warren Treme Banking Relationship

46. Prior to the founding of the Bank, Treme was a borrower at Bank B, where **RYAN** was President. **RYAN** and Treme were partners in several business ventures, including Wadsworth Estates. Despite this conflict of interest, **RYAN** exercised authority over Treme's loans at Bank B.

47. From at least April 2008, Treme was a borrower at First NBC Bank. Because of **RYAN** and Treme's business relationship, another Bank employee served as the loan officer for Treme's loans, while **BURNELL** served as the approving officer and assigned the credit risk rating. Although **RYAN** was not supposed to be involved in Treme's borrowing relationship, he continued to exercise authority over Treme's loans by, among other things, approving overdraft payments and loan disbursements.

48. From in or around June 2014 through April 2017, **RYAN** and **BURNELL** diverted loan proceeds to Treme and **RYAN's** co-owned businesses, knowing that Treme lacked sufficient income to pay his debts to the Bank. Further, **RYAN** and **BURNELL** knew that Treme was using loan proceeds on personal expenses or to make loan payments, contrary to the stated purposes of the loans.

*June 2014 Loan*

49.     In or around June 2014, Treme's loan officer informed **BURNELL** that Treme was "tired of being poor." Treme's loan officer told **BURNELL** that Treme wanted the loan officer to find a way to give Treme $50,000. Days later, on or about June 19, 2014, **BURNELL** approved an approximately $910,000 loan for Treme. **BURNELL** approved this loan and rated it a "6," despite his knowledge that Treme struggled financially and that his businesses had suffered net losses the prior year. **BURNELL** approved this Treme loan package, which falsely stated "the loan contains normal credit risks." Further, **BURNELL** recommended the loan's approval "due to [Treme's] good history with FNBC."

50.     The stated purpose of the June 2014 loan was to provide "working capital for long term investments" and to pay one of Treme's loans. Contrary to the loan's stated purpose, Treme used loan proceeds to pay personal expenses, including restaurants, bars, and golf fees.

*February 2016 Loan*

51.     On or about February 4, 2016, **BURNELL**, knowing that the purpose was false, signed a loan document approving a $250,000 unsecured loan to Treme "to cover business expenses." Contrary to the loan's stated purpose, Treme used approximately $49,000 in loan proceeds on renovations for his home and transferred approximately $81,000 in loan proceeds to another bank. He then spent that money on gambling, restaurants, bars, golf, and other personal expenses. Further, Treme spent approximately $74,000 in proceeds from the February 2016 loan on payments related to Wadsworth Estates, which benefited **RYAN**. **RYAN** did not disclose this expenditure to the Board, auditors, or examiners.

*BNW Ventures/Gulf Mississippi River Port*

52.     **RYAN** and **BURNELL** defrauded the Bank and Businessman P, a Bank customer, of funds and property through the use of two entities owned in part or wholly by Treme: BNW Ventures ("BNW") and Gulf Mississippi River Port ("GMRP").

53.     BNW was a company owned by Treme, Businessman P, and Businessman P's son. BNW owned rental properties. BNW also had a loan with the Bank. In 2015, Businessman P accused Treme of taking money out of BNW and using it for Treme's business with **RYAN**. On or about March 28, 2015, Treme told **RYAN** that he used $70,000 of BNW's funds to benefit **RYAN** and Treme's business.

54.     On or about June 21, 2015, Businessman P threatened to sue the Bank. Despite **RYAN's** repeated representations to the Board and others that he was not involved with matters related to Treme, in or around February 2016, **RYAN** and St. Angelo negotiated a settlement and release of Treme, Businessman P, and Businessman P's son from the BNW loan. In exchange for the release, Businessman P agreed to give the Bank $400,000 and BNW's rental properties. **BURNELL** signed the settlement and release documents for the Bank.

55.     In or around February 2016, **RYAN** received a $400,000 check from Businessman P and endorsed it on behalf of the Bank. On or about April 1, 2016, **RYAN** issued a check for $300,000 to Treme and another check for the remaining $100,000 to St. Angelo. Treme spent the $300,000 on, among other things, gambling at a casino, a trip to the Caribbean, and expenses related to Wadsworth Estates.

56.     **RYAN** and **BURNELL** further ensured that Treme benefitted from the release of the BNW loan to the detriment of the Bank. In March 2016, **BURNELL** approved a $2.4 million loan for Treme's company, GMRP. **BURNELL** risk rated the loan a "6" despite his knowledge of

Treme's poor financial status. The stated purpose for the loan was "for future business investments." **RYAN** and **BURNELL** then used the proceeds from the March 2016 loan to pay off BNW's debt, which had not been written off after **BURNELL** and Businessman P signed the settlement and release.

57.     On or about July 29, 2016, **BURNELL** signed loan documents renewing the approximately $2.4 million GMRP loan and approving an increase of $400,000. The stated purpose of the $400,000 increase was "minor improvements and working capital." **BURNELL** risk rated the loan a "6" despite his knowledge of Treme's poor financial status. A portion of the $400,000 was used for Treme's purchase of a home from the Bank employee who assisted Treme's loan officer with the loan documents. Further, approximately $198,000 of the loan proceeds were kicked back to GMRP. Treme then spent those proceeds on, among other things, gambling at a casino.

58.     On or about September 28, 2016, **RYAN** and **BURNELL** presented a renewal of the GMRP loan at a Board committee meeting. When a Board member asked why the Bank had released Businessman P as a guarantor, **RYAN** and **BURNELL** falsely answered that the Bank benefited by receiving a half-million dollar pay-down. In truth, as **RYAN** and **BURNELL** knew, **RYAN** gave the $400,000 from Businessman P to Treme and St. Angelo, not the Bank.

*November 2016 Loan*

59.     In October 2016, Treme and his entities appeared on a past-due loan report. In November 2016, to prevent Treme and his entities from being on the report again, **RYAN** and **BURNELL** caused an unsecured $70,000 loan to be given to Treme. **BURNELL** risk rated the loan a "6" despite his knowledge of Treme's poor financial status. The stated purpose of the loan was "temporary working capital" and "permanent financing of real estate." Contrary to the loan's

stated purpose, **RYAN** and **BURNELL** used approximately $64,000 in loan proceeds to pay **TREME's** loans, including approximately $25,000 on the GMRP loan.

### Jeffrey Dunlap Banking Relationship

60.     From in or around July 2009 through April 2017, Jeffrey Dunlap was a customer at the Bank. Dunlap owned Phoenix, a construction company. Beginning in or around March 2009, **RYAN** and Treme, through their business Wadsworth Estates, contracted with Dunlap and his company Phoenix to do construction work to prepare Wadsworth Estates for commercial development. Even though **RYAN** had a business relationship with Dunlap, **RYAN** served as the loan officer for Dunlap and Phoenix. **RYAN** failed to disclose this conflict of interest to the Board, auditors, and examiners.

61.     From 2009 through November 2016, **RYAN** and **BURNELL** fraudulently concealed **RYAN's** diversion of funds from Phoenix's Bank loans to pay for work done at Wadsworth Estates. This scheme benefitted **RYAN** and Treme, who owned Wadsworth Estates and sought to develop and sell the property for a profit. Dunlap benefited by receiving loans that he otherwise would not have received, the proceeds of which he fraudulently spent on personal expenses. **RYAN** and **BURNELL** concealed the true nature of these loans from the Board, auditors, and examiners.

62.     Phoenix used its accounts receivable from Wadsworth Estates and other clients as collateral for its borrowing. **RYAN** instructed Dunlap to falsely inflate his accounts receivable in order to increase the amount that Phoenix could borrow. Dunlap used the accounts receivable for his business as collateral for Phoenix's loans. At **RYAN's** direction, Dunlap inflated the value of these accounts receivable and did not disclose the age of the fraudulent accounts. This non-

21

disclosure created the false and fraudulent impression that the accounts were still collectable. In truth, most of the accounts receivable were non-existent or had been paid years earlier.

63.     From in or around 2009 through April 2017, **BURNELL** knew that **RYAN** owned Wadsworth Estates and that Wadsworth Estates was listed as an accounts receivable securing the Phoenix loans. **BURNELL** knew that **RYAN** was the loan officer on the Phoenix loans and thus had an improper conflict of interest in acting as the loan officer. Nevertheless, **BURNELL** signed at least 38 loan documents without disclosing **RYAN's** conflict of interest.

64.     From in or around 2009 through late 2016, **RYAN** and **BURNELL** approved numerous new loans, increases in loans, and credit extensions for Phoenix, despite knowing that loan proceeds were the primary source of Phoenix's payment of principal and interest. During this time, Phoenix's debt to the Bank continued to grow. Despite this, **BURNELL** kept Phoenix's risk rating a "6."

65.     From in or around April 2012 through November 2016, **RYAN** extended more than $16 million to Phoenix through methods that did not require any approval from the Board. **RYAN** chose these methods because they circumvented the Board's oversight and made it less likely that the Board, auditors, or examiners would discover that he was using Phoenix's loan proceeds to benefit Wadsworth Estates, the project he co-owned with Treme.

66.     **RYAN** fraudulently diverted at least $384,000 in Phoenix loan proceeds to pay for work done at Wadsworth Estates.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-37
### (Bank Fraud)

**A.**      The allegations contained in Parts A and C of Count One of this Indictment are hereby realleged and incorporated herein by reference.

**B.**      <u>**THE OFFENSE:**</u>

On or about the dates set forth below, in the Eastern District of Louisiana, the defendants, **ASHTON J. RYAN, JR., WILLIAM J. BURNELL, ROBERT B. CALLOWAY,** and **FRANK J. ADOLPH,** for the purpose of executing and attempting to execute the scheme and artifice to defraud did knowingly and with the intent to defraud, execute and attempt to execute a scheme and artifice to defraud First NBC Bank, a financial institution, thereby placing First NBC Bank at risk of civil liability or financial loss, by means of false and fraudulent pretenses, representations, and promises relating to a material fact, in violation of Title 18, United States Code, Section 1344(1).

**C.**      <u>**THE EXECUTION:**</u>

On or about the following dates listed below, the defendants, **ASHTON J. RYAN, JR., WILLIAM J. BURNELL, ROBERT B. CALLOWAY,** and **FRANK J. ADOLPH,** did knowingly execute and attempt to execute the scheme and artifice to defraud as described in Count One of this Indictment, by the following means:

| Count | Defendant | Date | Execution |
|---|---|---|---|
| 2 | **RYAN BURNELL CALLOWAY** | 11/23/2010 | **RYAN, BURNELL,** and **CALLOWAY** made false statements and material omissions in Gibbs's loan documents related to, among other things, the purpose of the loan and the source of repayment, causing approximately $347,000 in loan proceeds to be disbursed. Approximately $18,000 of the loan proceeds went to pay another borrower's loans and approximately $31,000 made a payment on Gibbs's house in Florida. |

| 3 | RYAN BURNELL | 11/30/2010 | **RYAN** and **BURNELL** caused $610,000 in fraudulent tax credit funds related to Annadele/Girod to be disbursed to St. Angelo's Premier Information Systems account when it was already overdrawn at the Bank by more than $400,000. |
|---|---|---|---|
| 4 | RYAN BURNELL CALLOWAY | 5/31/2011 | **RYAN, BURNELL,** and **CALLOWAY** made false statements and material omissions in Gibbs's loan documents related to, among other things, the purpose of the loan and the source of repayment, causing $500,000 in loan proceeds to be disbursed. Approximately $147,000 of the total loan proceeds covered Gibbs's personal expenses, including a house payment for approximately $6,000, approximately $9,000 for Gibbs's mother's medical care, and approximately $72,000 toward his private plane. |
| 5 | RYAN BURNELL | 7/29/2011 | **RYAN** and **BURNELL** caused approximately $450,000 in fraudulent tax credit investment funds for 622 Conti Street to be deposited into St. Angelo's Premier Information Systems account when it was already overdrawn by approximately $167,000. |
| 6 | RYAN BURNELL | 9/30/2011 | **RYAN** and **BURNELL** caused approximately $750,000 in fraudulent tax credit investment funds for 622 Conti Street to be deposited into St. Angelo's Premier Information Systems account when it was already overdrawn by approximately $442,000. |
| 7 | RYAN BURNELL CALLOWAY | 10/31/2011 | **RYAN, BURNELL,** and **CALLOWAY** made false statements and material omissions in Gibbs's loan documents related to, among other things, the purpose of the loan and the source of repayment, causing $500,000 in loan proceeds to be disbursed to Gibbs. Approximately $82,000 paid another borrower's loans and approximately $47,000 paid Gibbs's private plane expenses. |
| 8 | RYAN | 1/31/2012 | **RYAN** directed Dunlap to inflate Phoenix's receivables to support a Loan Advance Request for approximately $175,000 "to cover overdrafts." The overdrafts included an approximately $63,000 payment to American Express for personal expenses. Approximately $10,000 of the proceeds were funneled to Treme. Treme used approximately $6,000 on gambling expenses, restaurants, and golf. |

| 9 | RYAN BURNELL CALLOWAY | 5/18/2012 | **RYAN, BURNELL,** and **CALLOWAY** made false statements and material omissions in Gibbs's loan documents related to, among other things, the purpose of the loan and the source of repayment, causing approximately $1 million in loan proceeds to be disbursed. Approximately $102,000 paid Gibbs's plane expenses, and approximately $113,000 went to pay Gibbs's sport fishing boat expenses. |
|---|---|---|---|
| 10 | RYAN BURNELL CALLOWAY | 8/24/2012 | **RYAN, BURNELL,** and **CALLOWAY** made false statements and material omissions in Gibbs's loan documents related to, among other things, the purpose of the loan and the source of repayment, causing approximately $1 million in loan proceeds to be disbursed. More than $117,000 went to pay another borrower's loans. |
| 11 | RYAN BURNELL | 10/09/2012 | **RYAN** and **BURNELL** made false statements and material omissions in Nominee D's loan documents related to, among other things, the purpose of the loan. The approximately $1.6 million dollar loan was purportedly for an "investment" property. However, **RYAN** and **BURNELL** knew that it was for a personal home for Charity. |
| 12 | RYAN BURNELL CALLOWAY | 12/28/2012 | **RYAN, BURNELL,** and **CALLOWAY** made false statements and material omissions in Gibbs's loan documents related to, among other things, the purpose of the loan and the source of repayment, causing approximately $150,000 in loan proceeds to be disbursed. More than $71,000 went to pay another borrower's loans. |
| 13 | RYAN BURNELL CALLOWAY | 2/15/2013 | **RYAN, BURNELL,** and **CALLOWAY** made false statements and material omissions in Gibbs's loan documents related to, among other things, the purpose of the loan and the source of repayment, causing approximately $1 million in loan proceeds to be disbursed. A portion of the funds went to pay another borrower's loans. |
| 14 | RYAN | 3/26/2013 | **RYAN** created a false document describing the Bank's ownership of tax credits and caused it to be forwarded to external auditors to justify the Bank's investments in the 622 Conti property. |

25

| 15 | **RYAN BURNELL CALLOWAY** | 9/13/2013 | **RYAN, BURNELL,** and **CALLOWAY** made false statements and material omissions in Gibbs's loan documents related to, among other things, the purpose of the loan and the source of repayment, causing approximately $1 million in loan proceeds to be disbursed. More than $143,000 went to pay another borrower's loans. |
| --- | --- | --- | --- |
| 16 | **RYAN BURNELL CALLOWAY** | 10/17/2013 | **RYAN, BURNELL,** and **CALLOWAY** made false statements and material omissions in Gibbs's loan documents related to, among other things, the purpose of the loan and the source of repayment, causing approximately $1 million in loan proceeds to be disbursed. More than $86,000 went to pay another borrower's loans. |
| 17 | **RYAN BURNELL ADOLPH** | 3/27/2014 | **RYAN, BURNELL,** and **ADOLPH** made false statements and material omissions in loan documents, including that the purpose of the loan was to "finance accounts receivable of Metro Rediscount Company Inc." Loan proceeds went to pay other **ADOLPH** loans. |
| 18 | **RYAN BURNELL** | 6/19/2014 | **RYAN** and **BURNELL** made false statements and material omissions in Treme's loan documents related to, among other things, the purpose of the loan. Contrary to the stated purpose of the loan, Treme used loan proceeds to pay personal expenses, including restaurants, bars, and golf fees. |
| 19 | **RYAN BURNELL** | 7/31/2014 | **RYAN** and **BURNELL** caused approximately $830,000 in fraudulent tax credit investment funds for 622 Conti Street to be issued to St. Angelo's 616 Girod account to make payments on St. Angelo's outstanding loans and pay overdrafts. At the time, the 616 Girod account was more than $468,000 overdrawn. |
| 20 | **RYAN BURNELL** | 8/29/2014 | **RYAN** and **BURNELL** caused approximately $570,000 in fraudulent tax credit investment funds for 622 Conti Street to be issued to St. Angelo's 616 Girod account to make payments on St. Angelo's outstanding loans and pay overdrafts. At the time, the 616 Girod account was more than $278,000 overdrawn. |
| 21 | **RYAN** | 9/16/2014 | **RYAN** caused approximately $66,000 in loan proceeds for Phoenix, a company owned by Dunlap, to pay Contractor C for work done on Wadsworth Estates, **RYAN's** business with Treme. This payment was not disclosed to the Board, auditors, or examiners. |

| 22 | RYAN | 9/18/2014 | RYAN caused approximately $80,000 in Phoenix loan proceeds to pay Contractor C for work done on Wadsworth Estates, RYAN's business with Treme. This payment was not disclosed to the Board, auditors, or examiners. |
|----|------|-----------|------|
| 23 | RYAN BURNELL | 11/25/2014 | RYAN and BURNELL caused approximately $450,000 in fraudulent tax credit investment funds for 622 Conti Street to be issued to St. Angelo's 616 Girod account. At the time, the 616 Girod account was more than $139,000 overdrawn. |
| 24 | RYAN BURNELL | 12/23/2014 | RYAN and BURNELL caused approximately $450,000 in fraudulent tax credit investment funds for 622 Conti Street to be issued to St. Angelo's 616 Girod account. More than $240,000 of this total was used to pay St. Angelo's loan payments and approximately $38,000 was used to make payments at Annadele's restaurant. |
| 25 | RYAN BURNELL | 2/13/2015 | RYAN and BURNELL caused approximately $500,000 in fraudulent tax credit investment funds for 622 Conti Street to be issued to St. Angelo's 616 Girod account. Most of these funds were used by St. Angelo to purchase a different property with the knowledge of RYAN and BURNELL. |
| 26 | ADOLPH | 5/21/2015 | ADOLPH submitted a false and fraudulent statement from another bank for January 2015 in order to obtain loan proceeds from First NBC Bank. |
| 27 | RYAN BURNELL | 5/28/2015 | RYAN and BURNELL caused approximately $315,000 in fraudulent tax credit investment funds for 622 Conti Street to be issued to St. Angelo's 616 Girod account. More than $224,000 were used to pay St. Angelo's outstanding loan payments. |
| 28 | RYAN | 6/25/2015 | RYAN caused approximately $117,000 in Phoenix loan proceeds to pay Contractor M for work done on Wadsworth Estates, RYAN's business with Treme. This payment was not disclosed to the Board, auditors, or examiners. |
| 29 | RYAN | 10/16/2015 | RYAN caused approximately $55,000 in Phoenix loan proceeds to pay Contractor T for work done on Wadsworth Estates, RYAN's business with Treme. This payment was not disclosed to the Board, auditors, or examiners. |

| 30 | RYAN BURNELL | 12/27/2015 | **RYAN** and **BURNELL** caused approximately $350,000 of Bank funds to be disbursed to a Charity entity, purportedly to enclose the patio at 620 Decatur Street, when they knew the funds were not used to enclose the patio. They were used, in part, to pay interest on a Charity loan, tuition, credit card payments, and life insurance. No proceeds were used to enclose the patio. |
|---|---|---|---|
| 31 | RYAN | 2/17/2016 | **RYAN** caused approximately $65,000 in Phoenix loan proceeds to pay Contractor T for work done on Wadsworth Estates, **RYAN's** business with Treme. This payment was not disclosed to the Board, auditors, or examiners. |
| 32 | RYAN BURNELL | 2/12/2016 | **RYAN** and **BURNELL** made false statements and material omissions in Treme's loan documents related to, among other things, the purpose of the loan, causing approximately $250,000 in loan proceeds to be disbursed to Treme. Approximately $74,000 in proceeds went to Wadsworth Estates and approximately $49,000 went to Treme's home renovation. Treme also withdrew approximately $81,000 in cash. |
| 33 | RYAN BURNELL CALLOWAY | 3/21/2016 | **RYAN, BURNELL,** and **CALLOWAY** made false statements and material omissions in Gibbs's loan documents related to, among other things, the purpose of the loan and the source of repayment, causing approximately $3 million in loan proceeds to be disbursed to Gibbs. Approximately $31,000 went to pay another borrower's loans. |
| 34 | RYAN BURNELL | 3/29/2016 | **RYAN** and **BURNELL** caused approximately $350,000 in Bank funds to be disbursed to a Charity entity, purportedly to enclose the patio at 620 Decatur Street, when they knew the funds were not used to enclose the patio. In reality, proceeds were used to pay Charity's personal credit cards, life insurance policies, summer camp, tuition, and approximately $124,000 to make loan payments. |
| 35 | RYAN BURNELL | 8/31/2016 | **RYAN** and **BURNELL** caused approximately $500,000 in Bank funds to be disbursed to a Charity entity, purportedly to enclose the patio at 620 Decatur Street, when they knew the funds were not used to enclose the patio. In reality, proceeds were used to pay Charity's personal credit cards, tuition, after school programs, pet services, and loan payments. |

| 36 | RYAN BURNELL | 11/29/2016 | RYAN and BURNELL made false statements and material omissions in Phoenix loan documents related to, among other things, the purpose of the loan and Phoenix's creditworthiness. The stated purpose of the loan was for "working capital." In reality, the proceeds covered, among other things, $165,000 in loan payments on outstanding Phoenix loans and $28,000 for a hunting trip taken by Dunlap. |
| 37 | RYAN BURNELL | 11/29/2016 | RYAN and BURNELL made false statements and material omissions in Treme's loan documents related to, among other things, the purpose of the loan, causing approximately $70,000 in loan proceeds to be disbursed to Treme. Approximately $64,000 in proceeds went to make loan payments for Treme. |

All in violation of Title 18, United States Code, Sections 1344(1) and 2.

### COUNTS 38-46
(False Entries in Bank Records)

On or about the dates set forth below, in the Eastern District of Louisiana, the defendants **ASHTON J. RYAN, JR., WILLIAM J. BURNELL, ROBERT B. CALLOWAY,** and others known and unknown to the Grand Jury, with the intent to injure and defraud First NBC Bank, a financial institution that was insured by the Federal Deposit Insurance Corporation, and to deceive any officer of the Bank, the Federal Deposit Insurance Corporation, any agent or examiner appointed to examine the affairs of such bank, and the Board of Governors of the Federal Reserve System, knowingly made the following false entries in the books, reports, and statements of the Bank:

| Count | Defendant | Date | False Entry |
|---|---|---|---|
| 38 | RYAN | 3/30/2012 | With intent to deceive the Board, auditors, and examiners, RYAN placed a false and fraudulent Change in Terms Authorization for Charity loan 5317 in the books and records of the Bank. RYAN misrepresented the reason why Charity's loans needed an extension. |

| 39 | **RYAN** | 3/30/2012 | With intent to deceive the Board, auditors, and examiners, **RYAN** placed a false and fraudulent Change in Terms Authorization for Charity loan 5789 in the books and records of the Bank. **RYAN** misrepresented the reason why Charity's loans needed an extension. |
|---|---|---|---|
| 40 | **RYAN** | 3/30/2012 | With intent to deceive the Board, auditors, and examiners, **RYAN** placed a false and fraudulent Change in Terms Authorization for Charity loan 0136 in the books and records of the Bank. **RYAN** misrepresented the reason why Charity's loans needed an extension. |
| 41 | **RYAN BURNELL CALLOWAY** | 9/15/2014 | With intent to deceive the Board, auditors, and examiners, **RYAN, BURNELL,** and **CALLOWAY** placed a false and fraudulent Criticized Asset Action Plan pertaining to Gibbs in the books and records of the Bank, falsely stating that "all loans are performing as agreed" and omitting the material fact that Gibbs was only able to make payments on his existing loans by obtaining new loans from the Bank. |
| 42 | **RYAN BURNELL CALLOWAY** | 3/18/2015 | With intent to deceive the Board, auditors, and examiners, **RYAN, BURNELL,** and **CALLOWAY** placed a false and fraudulent Criticized Asset Action Plan pertaining to Gibbs in the books and records of the Bank, falsely stating that "all loans are performing as agreed" and omitting the material fact that Gibbs was only able to make payments on his existing loans by obtaining new loans from the Bank. |
| 43 | **RYAN BURNELL CALLOWAY** | 9/17/2015 | With intent to deceive the Board, auditors, and examiners, **RYAN, BURNELL,** and **CALLOWAY** placed a false and fraudulent Criticized Asset Action Plan pertaining to Gibbs in the books and records of the Bank, falsely stating that "all loans are performing as agreed" and omitting the material fact that Gibbs was only able to make payments on his existing loans by obtaining new loans from the Bank. |
| 44 | **CALLOWAY** | 1/15/2016 | With intent to deceive the Board, auditors, and examiners, **CALLOWAY** placed a false and fraudulent Loan Review document about Gibbs into the books and records of the Bank, which was also transmitted to outside auditors. The Loan Review document made misrepresentations and material omissions about Gibbs's loans, and it did not disclose that Gibbs was only able to make payments on his existing loans by obtaining new loans from the Bank. |

| 45 | **RYAN BURNELL CALLOWAY** | 1/21/2016 | With intent to deceive the Board, auditors, and examiners, **RYAN**, **BURNELL**, and **CALLOWAY** placed a false and fraudulent Criticized Asset Action Plan pertaining to Gibbs in the books and records of the Bank, falsely stating that "all loans are performing as agreed" and omitting the material fact that Gibbs was only able to make payments on his existing loans by obtaining new loans from the Bank. |
| 46 | **RYAN BURNELL CALLOWAY** | 3/18/2016 | With intent to deceive the Board, auditors, and examiners, **RYAN**, **BURNELL**, and **CALLOWAY** placed a false and fraudulent Criticized Asset Action Plan pertaining to Gibbs in the books and records of the Bank, falsely stating that "all loans are performing as agreed" and omitting the material fact that Gibbs was only able to make payments on his existing loans by obtaining new loans from the Bank. |

All in violation of Title 18, United States Code, Sections 1005 and 2.

### NOTICE OF FORFEITURE

1.      The allegations contained in Counts 1 through 46 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(2)(A).

2.      Upon conviction of the offenses in violation of Title 18, United States Code, Sections 1349, 1344, and 1005 set forth in Counts 1 through 46 of this Indictment, the defendants, **ASHTON J. RYAN, JR., WILLIAM J. BURNELL, ROBERT B. CALLOWAY**, and **FRANK J. ADOLPH**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violation(s).

3.      If any of the property described above, as a result of any act or omission of the defendants:

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided without

             difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to

Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code,

Section 982(b)(1).

      All pursuant to 18 U.S.C. § 982(a)(2)(A).

A TRUE BILL:

FOREPERSON

MICHAEL M. SIMPSON
Attorney for the United States
Acting under authority conferred
by 28 U.S.C. § 515

SHARAN E. LIEBERMAN
Assistant United States Attorney

MATTHEW R. PAYNE
Assistant United States Attorney

NICHOLAS D. MOSES
Assistant United States Attorney

J. RYAN McLAREN
Assistant United States Attorney

New Orleans, Louisiana
July 10, 2020

32

FORM OBD-34

No. _____

# UNITED STATES DISTRICT COURT

Eastern _____ District of _____ Louisiana

Criminal _____ Division

## THE UNITED STATES OF AMERICA

vs.

**ASHTON J. RYAN, WILLIAM J. BURNELL,**
**ROBERT B. CALLOWAY, and FRANK J. ADOLPH**

## INDICTMENT

**INDICTMENT FOR CONSPIRACY**
**TO COMMIT BANK FRAUD,**
**BANK FRAUD, AND FALSE ENTRIES**

_____

**VIOLATIONS:**

18 U.S.C. § 1349
18 U.S.C. § 1344
18 U.S.C. § 1005
18 U.S.C. § 2

_____

Filed in open court this _____

_____ day of

_____ A.D. 2020.

- - - - - - - - - - - - - - - - - - - - -
Clerk

- - - - - - - - - - - - - - - - - - - - -

Bail, $ - - - - - - - - - - - - - - - - - -

_____

**SHARAN E. LIEBERMAN**
**Assistant United States Attorney**